**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 25, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

A.M., on behalf of her minor child,
F.M.,[*]

　　　　　Plaintiff-Appellant,

v.

ANN HOLMES; PRINCIPAL SUSAN
LABARGE; ARTHUR ACOSTA, City
of Albuquerque Police Officer, in his
individual capacity,

　　　　　Defendants-Appellees.

Nos. 14-2066; 14-2183

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. Nos. 1:13-CV-00356-MV-LAM;**
**1:12-CV-00074-KG-CG)**

Joseph P. Kennedy of Kennedy Kennedy & Ives, LLC, Albuquerque, New Mexico
(Shannon L. Kennedy and Michael L. Timm, Jr. of Kennedy Kennedy & Ives,
LLC, Albuquerque, New Mexico, with him on the briefs), for Plaintiff-Appellant.

Emil J. Kiehne of Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque,
New Mexico, and Kathryn Levy, Deputy City Attorney for the City of

---

[*]　　　We use fictitious initials rather than a name to preserve the
anonymity of F.M., who is a minor. *See Starkey ex rel. A.B. v. Boulder Cty. Soc.
Servs.*, 569 F.3d 1244, 1244 n.* (10th Cir. 2009). Because F.M.'s identity would
be discernible from his mother's name, we use fictitious initials when referring to
Plaintiff-Appellant A.M. as well.

Albuquerque, New Mexico (Jennifer G. Anderson and Megan T. Muirhead of Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico, with them on the briefs), for Defendants-Appellees.

———————————

Before **TYMKOVICH**, Chief Judge, and **GORSUCH** and **HOLMES**, Circuit Judges.

———————————

**HOLMES**, Circuit Judge.

———————————

Plaintiff-Appellant A.M. filed this action under 42 U.S.C. § 1983 on behalf of her minor child, F.M., against two employees of the Albuquerque Public Schools—specifically, Cleveland Middle School ("CMS") Principal Susan LaBarge and Assistant Principal Ann Holmes—and against Officer Arthur Acosta of the Albuquerque Police Department ("APD"). A.M. brought several claims stemming from two school-related events: (1) the May 2011 arrest of F.M. for allegedly disrupting his physical-education class, and (2) the November 2011 search of F.M. for contraband. Ms. Holmes and Ms. LaBarge sought summary judgment on the basis of qualified immunity, and the district court granted their respective motions. The court also denied A.M.'s motion for summary judgment on her claims pertaining to Officer Acosta after determining that Officer Acosta was entitled to prevail on qualified-immunity grounds.

On appeal, A.M. contends that the district court erred in awarding qualified immunity to all of the defendants. We have consolidated these matters for our

2

review.[1]  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **affirm** each grant of qualified immunity.

## I.  BACKGROUND

### A.  May 2011 Arrest of F.M.

On May 19, 2011, CMS physical-education teacher Margaret Mines-Hornbeck placed a call on her school-issued radio to request assistance with a student.  Officer Acosta, the school resource officer, responded to the call.  As he approached the designated classroom, he saw a student—later identified as F.M., who was then thirteen years old and in the seventh grade—sitting on the hallway floor adjacent to the classroom[2] while Ms. Mines-Hornbeck stood in the hallway near the classroom door.  Other students were peering through the doorway.

Ms. Mines-Hornbeck explained that F.M. had generated several fake burps, which made the other students laugh and hampered class proceedings.  After F.M. ignored her requests to stop making those noises, Ms. Mines-Hornbeck ordered him to sit in the hallway.  F.M. nominally complied, but once he was situated in the hallway, he leaned into the classroom entranceway and continued to burp and laugh.  This obliged Ms. Mines-Hornbeck to "hav[e] to deal with [F.M.]

---

[1]  Ms. Holmes is the sole defendant-appellee in Case No. 14-2066; Ms. LaBarge and Officer Acosta are defendants-appellees in Case No. 14-2183.  For clarity's sake, citations to the briefs and A.M.'s appendices include parentheticals identifying the case number with which the cited documents are associated.

[2]  Ms. Mines-Hornbeck had convened her physical-education class in a classroom that day to facilitate the students' project presentations.

3

repeatedly" and rendered her unable to continue teaching the class. Aplt.'s App. (No. 14-2183) at 289 (Acosta's Dep., dated Dec. 3, 2012). Ms. Mines-Hornbeck told Officer Acosta that she "need[ed] [F.M.] removed from [t]here" because she could not control F.M. *Id.* at 288.

At some point during Ms. Mines-Hornbeck's conversation with Officer Acosta, F.M. interjected, saying, "That didn't happen. No, that's not true." *Id.* Nonetheless, based on what he had observed, Officer Acosta asked F.M. to come with him. F.M. cooperated; he accompanied Officer Acosta to CMS's administrative office and waited in a chair while Officer Acosta retrieved a computer from his patrol car.

Officer Acosta then informed F.M. that, "[b]ecause of the disruptions [he] saw," *id.* at 293, he would be arresting F.M. for interfering with the educational process in violation of N.M. Stat. Ann. § 30-20-13(D),[3] which is a petty misdemeanor offense. Once again, F.M. stated that he had done nothing wrong. However, Officer Acosta did not "go into great detail with [F.M.]," Aplt.'s App. (14-2183) at 292, which is to say that he did not invite further discussion of F.M.'s version of events. Aware that he possessed complete discretion concerning whether to arrest F.M. or issue a citation, Officer Acosta believed that

---

[3] In full, subsection (D) reads: "No person shall willfully interfere with the educational process of any public or private school by committing, threatening to commit or inciting others to commit any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions of a public or private school." N.M. Stat. Ann. § 30-20-13(D).

he had a legitimate basis to arrest (i.e., probable cause) based on (1) Ms. Mines-Hornbeck's statement that F.M.'s (fake) burping and other specified misconduct prevented her from controlling her class, and (2) his observation that, when he responded to Ms. Mines-Hornbeck's call, "there was no more teaching going on," *id.* at 289, because Ms. Mines-Hornbeck was monitoring F.M. in the hallway. Officer Acosta thus drafted the necessary incident report, leaving F.M. outside the administrative office. He did not place F.M. in handcuffs at that point because F.M. posed no flight risk and "was not combative." *Id.* at 293.

When Officer Acosta advised Ms. LaBarge of his plan to arrest F.M., Ms. LaBarge prepared a disciplinary referral slip that denoted "Police or Outside Agency" action and imposed a one-day suspension to be served May 20, 2011. *Id.* at 118 (Discipline Referral, dated May 19, 2011). She gave Officer Acosta "the duplicate . . . Parent/Student copy" of the referral slip. *Id.* at 114 (LaBarge's Aff., dated Sept. 20, 2012). Meanwhile, pursuant to school policy, Ms. LaBarge's administrative assistant attempted to notify A.M. She called the two telephone numbers listed in F.M.'s enrollment records, but to no avail: the first number had been disconnected, and the second number lacked a functioning voicemail account.

After completing his paperwork, Officer Acosta said to F.M., "Let's go to the car." *Id.* at 295. F.M. responded, "Okay," and walked to Officer Acosta's patrol car without incident. *Id.* Although he had not "laid a finger on

5

[F.M.] . . . up to th[at] point," Officer Acosta told F.M. when they reached the vehicle that he would be performing a pat-down search "per APD policy." *Id.* F.M. indicated that he had no weapons or contraband on his person, and Officer Acosta found neither during the pat-down search. At that point, Officer Acosta handcuffed F.M., placed him in the patrol car, and drove him to the juvenile detention center.

F.M. was booked into the detention center at approximately 1:30 p.m. As Officer Acosta expected, a detention-center staff member completed F.M.'s risk assessment instrument before releasing F.M. to the custody of A.M. at around 2:30 p.m. Shortly thereafter, A.M. visited Ms. LaBarge at CMS to discuss F.M.'s suspension. By both accounts, the conversation was unproductive. *See id.* at 18 (Compl., filed Nov. 30, 2011) (embodying A.M.'s averment that Ms. LaBarge had unreasonably suspended F.M. without holding a hearing); *id.* at 115 (reflecting Ms. LaBarge's statement that A.M.'s demeanor "prevented [them] from having a reasonable . . . discussion").

F.M. served his suspension and did not return to CMS for the remainder of the 2010–11 school year. Not surprisingly, the story of his arrest garnered some publicity. A.M. "spoke publicly" about the incident and "provided interviews to local news media." Aplt.'s App. (14-2066) at 14 (Compl., filed Feb. 28, 2013). According to Officer Acosta, news coverage of F.M.'s arrest "was on the airways quite a bit," much to the chagrin of school administrators. *Id.* at 115.

## B. November 2011 In-School Search of F.M.

A.M. re-enrolled F.M. at CMS for the 2011–12 school year. F.M. was attending school on November 8, 2011, the date of the second event prompting this litigation. That morning, a CMS student approached a teacher to report having witnessed a potential drug transaction on campus. The student recounted having seen approximately five other students carrying small baggies containing what appeared to be marijuana; these individuals seemed to be exchanging money for drugs. Though unsure of the observed students' identities, the reporting student "gave . . . a location in the hallway where the incident took place." *Id.* at 122 (Uniform Incident Report, dated Nov. 9, 2011).

Ms. Holmes was notified of the student's report and "contacted [Officer Acosta] on the school radio . . . in regards to [the] suspicious situation." *Id.* Officer Acosta then retrieved the school's security-camera footage to see if it might assist school administrators' efforts to identify the students of interest. During their review of the footage corresponding to the time and place described by the reporting student, Ms. Holmes and Ms. LaBarge recognized the five students involved in the suspicious transaction—including, as relevant here, F.M. These students were summoned to the administrative office while school representatives endeavored to contact the students' parents to inform them that their children would be searched in connection with a suspected drug transaction. The only student for whom a parent could not be reached was F.M.

7

All of the students were searched in a conference room next to Ms. LaBarge's office. Several adults were present: Ms. LaBarge, Ms. Holmes, Officer Acosta, a male teacher, and APD Officer Kiel Higgins. The first four searches and interviews were audio-recorded. According to Officer Acosta, these four students were asked to remove their shoes and empty their pockets. Two students stated that they had seen marijuana, "but [they] stopped short of saying who had it in their possession." *Id.* Another student reported seeing F.M. with money. No drugs were found on any of the first four students.

As for F.M., one of the adults videotaped his search and interview using Officer Higgins's lapel camera. F.M. emptied his pockets and produced $200 in cash, including a $100 bill.[4] Ms. Holmes asked F.M. if he had anything he was not supposed to have, and F.M. answered that he had a marijuana-leaf belt buckle. A search of F.M.'s backpack produced, among other items, a red bandana and a belt buckle displaying an image of a marijuana leaf. Both items violated CMS's prohibition of "bandanas," "gang-related" clothing, and apparel displaying "inappropriate messages or symbols." Aplt.'s App. (14-2183) at 122 (Uniform Dress Policy, filed Sept. 21, 2012).

---

[4] F.M. explained that the cash was a birthday gift from his father. When Ms. Holmes requested contact information for his father, F.M. was unable to provide it. Ms. Holmes knew that F.M.'s fourteenth birthday was in August 2011 (i.e., several months prior to the search) and that CMS's enrollment files contained no data regarding F.M.'s father.

F.M. was wearing "numerous layers of clothing," *id.* at 190 (LaBarge's Dep., dated Dec. 14, 2012), including a long-sleeved athletic shirt, a short-sleeved shirt layered over the first shirt, a pair of jeans, two pairs of athletic shorts, and boxer-shorts underwear. When prompted, he took off his shoes. F.M. also complied with a request to remove his jeans and place them on a table after demonstrating that he was wearing shorts underneath. At the school administrators' behest, the male teacher inspected F.M.'s waistband. He flipped down the waistband of the first pair of athletic shorts to reveal the second pair. The teacher left undisturbed the waistbands of F.M.'s other pair of athletic shorts and his boxer shorts. F.M. then removed one pair of athletic shorts and his short-sleeved shirt, which left him wearing a long-sleeved shirt, a pair of athletic shorts, and boxer-shorts underwear. Shortly thereafter, F.M. donned the rest of his clothing. The search of F.M.'s person, his removed clothing, and his backpack yielded no marijuana.

While F.M. was in the office, the school received a return phone call from A.M. Ms. LaBarge communicated with A.M., describing the events and the items recovered in the search of F.M. During the conversation, A.M. confirmed that F.M. had left home carrying $200 that morning. Ms. LaBarge elected "not [to] discipline F.M. for the suspected drug transaction due to his mother's corroboration of" why he possessed $200 in cash. *Id.* at 117. However, Ms. LaBarge imposed a three-day in-school suspension, marking "Dress Code

9

Violation," "General Disruptive Conduct," and "Gang-Related Activity[—]red bandana" on the associated referral form. *Id.* at 123 (Discipline Referral, dated Nov. 8, 2011).

Later that day, Ms. LaBarge met with A.M. to explain the search and suspension. She subsequently stated that A.M. "stormed out" after "refus[ing] to listen" and saying "her attorney would contact [the school]." *Id.* After November 8, 2011, F.M. did not return to CMS.

## C. Procedural History

On November 30, 2011, A.M. filed a lawsuit in New Mexico state court against Ms. LaBarge, Ms. Mines-Hornbeck, and Officer Acosta. A.M. alleged in the complaint that the defendants deprived F.M. of his civil rights by arresting him in May 2011 under N.M. Stat. Ann. § 30-20-13(D) and by handcuffing him while effecting the arrest—asserting Fourth Amendment violations as to both claims. Notably, A.M. opined that a reasonable officer "should have known that burping was not a crime" and that "no force was necessary" to facilitate the arrest. Aplt.'s App. (14-2183) at 21. A.M. also alleged that in November 2011, Ms. LaBarge violated F.M.'s Fourth Amendment right to be free from unlawful searches, claiming that Ms. LaBarge's "strip-searching" of F.M. was unreasonable. *Id.* at 22.

After the defendants removed the action to federal court, Ms. LaBarge and Ms. Mines-Hornbeck filed a motion for summary judgment, asserting the defense

10

of qualified immunity. In January 2013, after opposing the motion, A.M. agreed to the dismissal of all claims against Ms. Mines-Hornbeck and all claims against Ms. LaBarge pertaining to the arrest. And, in reply, Ms. LaBarge re-urged that she could avail herself of qualified-immunity protection on the claim stemming from the search.

On April 8, 2013, the district court granted Ms. LaBarge's motion for summary judgment based on its finding that she was entitled to qualified immunity. The court rested its qualified-immunity ruling on its conclusion that A.M. had failed to demonstrate that Ms. LaBarge committed a constitutional violation during the search of F.M. More specifically, applying the Supreme Court's reasoning in *Safford Unified School District No. 1 v. Redding*, 557 U.S. 364 (2009), and *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), the court found (1) that the search of F.M. was justified at its inception because school administrators perceived "a moderate chance of finding evidence of wrongdoing," Aplt.'s App. (14-2183) at 256 (Mem. Op. & Order, filed Apr. 8, 2013); and (2) that the search was "conducted in a manner that was reasonably related . . . to the circumstances which justified the search in the first place," *id.* at 257.

In February 2013, while the claims detailed *supra* were still pending, A.M. filed another state-court lawsuit against Ms. Holmes, also bringing claims related to the November 2011 search. A.M. alleged that Ms. Holmes (1) unreasonably searched F.M., thereby violating the Fourth Amendment; (2) commenced F.M.'s

11

search to retaliate against A.M. for speaking to the media about the May 2011 arrest, thereby allegedly violating F.M.'s First Amendment rights; and (3) "treated F.M. differently" than "other similarly situated students" during the search, thereby violating the Equal Protection Clause of the Fourteenth Amendment. Aplt.'s App. (14-2066) at 20 (Compl., filed Feb. 28, 2013). After removing the action to federal court, Ms. Holmes moved for summary judgment on the grounds of qualified immunity and collateral estoppel. As to the latter ground, Ms. Holmes argued: "Plaintiff lost her claim for unlawful search against Principal LaBarge and has simply reasserted the identical claim based on the identical facts against Assistant Principal Holmes." *Id.* at 42 (Holmes's Mot. for Summ. J., filed June 17, 2013).

The district court granted Ms. Holmes's motion for summary judgment. First, it concluded that "the elements necessary to invoke collateral estoppel [were] met"—namely: (1) A.M. was a party to the action against Ms. LaBarge; (2) in the prior action, the district court adjudicated A.M.'s Fourth Amendment claim on the merits; (3) A.M. presented the same issue implicated in the prior action (the reasonableness *vel non* of the search); and (4) A.M. received a "full and fair opportunity to litigate the relevant issue." *Id.* at 164, 165 (Mem. Op. & Order, filed Mar. 31, 2014). The court also determined that dismissal of A.M.'s claims against Ms. Holmes was "required because [Ms. Holmes] did not violate a clearly established right in searching F.M.," *id.* at 166, and "because it was not clearly

12

established that a search of a student based on reasonable suspicion could give rise to a First Amendment retaliation claim," *id.* at 171–72. Lastly, the court rejected A.M.'s equal-protection claim after finding that A.M. had not presented evidence to show that F.M. was treated differently from similarly situated students.

In August 2013—i.e., after the district court granted Ms. LaBarge's summary-judgment motion, but before the court granted Ms. Holmes's motion—A.M. moved for summary judgment on her claims against Officer Acosta. She argued that Officer Acosta committed a constitutional violation when he arrested F.M. for interfering with the educational process under N.M. Stat. Ann. § 30-20-13(D). She further asserted that Officer Acosta committed a constitutional violation when he handcuffed F.M. and that "[c]learly established common and statutory New Mexico [l]aw put [Officer Acosta] on notice" that handcuffing F.M. could give rise to liability under § 1983. Aplt.'s App. (14-2183) at 282 (A.M.'s Mot. for Summ. J., filed Aug. 15, 2013).

On September 19, 2014, after Officer Acosta responded to A.M.'s motion and argued for qualified immunity, the district court ruled on the motion. The court awarded qualified immunity to Officer Acosta regarding F.M.'s arrest based on its view that "F.M.'s right to be free from arrest was not clearly established at the time of the alleged misconduct." *Id.* at 395 (Mem. Op. & Order, filed Sept. 19, 2014). It also concluded that Officer Acosta was protected by qualified

13

immunity on the excessive-force claim because A.M. had not shown that F.M. suffered any "actual physical or emotional injury," *id.* at 397, and thus had not demonstrated that Officer Acosta committed a Fourth Amendment violation in that regard. Not only did the court deny A.M.'s motion, it also dismissed A.M.'s claims against Officer Acosta with prejudice.

A.M. filed timely notices of appeal from all three of the district court's orders granting qualified immunity to Officer Acosta, Ms. Holmes, and Ms. LaBarge. We have consolidated these actions for our review.

## II. STANDARD OF REVIEW

The defense of qualified immunity "protects governmental officials from liability for civil damages insofar as their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also Mullenix v. Luna*, --- U.S. ----, 136 S. Ct. 305, 308 (2015) (per curiam) ("Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))). This doctrine "not only protects public employees from liability, [but] also protects them from the burdens of litigation." *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013); *see Price-Cornelison v. Brooks*, 524 F.3d 1103, 1108 (10th Cir. 2008) (noting that qualified immunity provides "a right not to

14

stand trial in the first place").  In light of these purposes, "we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions."  *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

When a defendant asserts the defense of qualified immunity, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, *and* (2) that the right was "clearly established" at the time of the challenged conduct.'"  *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  In other words, if the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense.  *See, e.g.*, *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) ("[T]he 'record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'" (quoting *Medina*, 252 F.3d at 1128)); *see also Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015) ("[B]y asserting the qualified-immunity defense, Sheriff Glanz triggered a well-settled twofold burden that Ms. Cox was compelled to shoulder: not only did she need to rebut the Sheriff's no-constitutional-violation arguments, but she also had to demonstrate that any constitutional violation was grounded in then-extant clearly established law.").

15

We have discretion to address either prong first, *see Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013)—*viz.*, where appropriate, we may determine that "the right that [the plaintiff's] claim implicates . . . was not clearly established [at the relevant time]," *Cox*, 800 F.3d at 1247; *see, e.g.*, *Pearson*, 555 U.S. at 243 ("[W]e hold that petitioners are entitled to qualified immunity because the entry did not violate clearly established law."). "For a constitutional right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *accord Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008).

In that regard, we exercise "special care to 'define the clearly established right at issue on the basis of the specific context of the case' and, in so doing, avoid defining the 'case's context in a manner that imports genuinely disputed factual propositions.'" *Felders*, 755 F.3d at 885 (quoting *Tolan v. Cotton*, --- U.S. ----, 134 S. Ct. 1861, 1866 (2014) (per curiam)); *see Mullenix*, 136 S. Ct. at 308 ("'We have repeatedly told courts . . . not to define clearly established law at a high level of generality.' The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" (omission in original) (quoting *al-Kidd*, 563 U.S. at 742)); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (noting that the clearly-established-law "inquiry 'must be

16

undertaken in light of the specific context of the case, not as a broad general proposition.'" (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009))).

Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct "by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established weight of authority from other courts must have found the law to be as [she] maintains.'" *Quinn*, 780 F.3d at 1005 (quoting *Weise*, 593 F.3d at 1167); *accord Cox*, 800 F.3d at 1247. However, "we do not always require case law *on point*," *Morris v. Noe*, 672 F.3d 1185, 1196–97 (10th Cir. 2012) (emphasis added), and "the Supreme Court has warned that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances,'" *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "We have therefore adopted a sliding scale to determine when law is clearly established. 'The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" *Id.* (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)); *accord Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008). Although A.M. need not show that "the very action in question [has] . . . previously been held unlawful, 'in the light of pre-existing law the unlawfulness must be apparent.'"

17

*Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995) (quoting *Creighton*, 483 U.S. at 640).

Lastly, in determining whether the plaintiff has satisfied the necessary two-pronged qualified-immunity showing, courts ordinarily accept the plaintiff's version of the facts—that is, "the facts alleged," *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)—but "because at summary judgment we are beyond the pleading phase of the litigation, [the] plaintiff's version of the facts must find support in the record," *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009); *see York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) ("As with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" (alterations in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007))).

## III.  DISCUSSION

Our review of the district court's rulings concerning "[l]iability under § 1983 . . . , and [the] defendants' entitlement to qualified immunity, turn[s] on an individual assessment of each defendant's conduct and culpability." *Pahls v. Thomas*, 718 F.3d 1210, 1233 (10th Cir. 2013).  We will address A.M.'s claims against Officer Acosta, Ms. Holmes, and Ms. LaBarge in turn.

## A. Claims Against Officer Acosta

When A.M. moved for summary judgment on her claims against Officer Acosta, she argued that he could not avail himself of qualified-immunity protection. Officer Acosta then lodged his response, invoking the defense of qualified immunity therein. Once the motion was fully briefed, the district court concluded that Officer Acosta *was* entitled to qualified immunity; not only did it deny the motion, the court also dismissed A.M.'s claims against Officer Acosta with prejudice.

On appeal, A.M. first contends that the court erred by entering judgment in Officer Acosta's favor *sua sponte* without affording her the requisite notice set forth in the Federal Rules of Civil Procedure. A.M. also seeks reversal of the court's grant of qualified immunity to Officer Acosta on her Fourth Amendment unlawful-arrest and excessive-force claims. We discern no reversible error and therefore uphold the relevant district court rulings.

### 1. Procedural Propriety of Summary Judgment Grant

Before granting summary judgment in favor of a non-movant—here, Officer Acosta—the district court must "giv[e] notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). The court "may grant summary judgment sua sponte 'so long as the losing party was on notice that [it] had to come forward with all of [its] evidence.'" *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 892 (10th Cir. 1997) (alterations in original) (quoting *Celotex*

19

*Corp. v. Catrett*, 477 U.S. 317, 326 (1986)). "While the practice of granting summary judgment sua sponte is not favored," we will affirm the judgment when the losing party has received adequate notice of the need to marshal evidence. *Scull v. New Mexico*, 236 F.3d 588, 600 (10th Cir. 2000). Moreover, even if we deem the court's notice unsatisfactory, "we will still affirm a grant of summary judgment if the losing party suffered no prejudice from the lack of notice." *Johnson v. Weld Cty.*, 594 F.3d 1202, 1214 (10th Cir. 2010).

Based on our review of this case's procedural history, we find it pellucid that A.M. was aware that the district court planned to rule on the issue of qualified immunity with respect to Officer Acosta. Indeed, that was one matter on which A.M. *herself* requested a ruling. *See* Aplt.'s App. (14-2183) at 260 (reflecting A.M.'s "anticipat[ion]" in her summary-judgment motion that "Defendant Acosta w[ould] claim qualified immunity" and requesting that the court find that "Defendant Acosta is not entitled to qualified immunity"); *see also id.* at 279–80 (arguing that "[o]nly if an officer's use of force in a case is objectively reasonable . . . is the defense of qualified immunity available" and citing qualified-immunity caselaw).

But even assuming *arguendo* that A.M. did not know if Officer Acosta would rely upon qualified immunity in addressing her motion—that is, whether Officer Acosta would put forward the qualified-immunity issue for resolution—any uncertainty would perforce have dissipated when Officer Acosta

20

actually filed his response brief. Quite unremarkably, Officer Acosta *did* assert the qualified-immunity defense, and his arguments evidently prompted A.M. to devote the lion's share of her reply brief to the issue of qualified immunity. *See* Aplt.'s App. (14-2183) at 334, 340 (entitling the two sections of her reply brief (1) "Defendant Acosta is not entitled to qualified immunity for his arrest of F.M. for purportedly violating [N.M. Stat. Ann. § 30-20-13(D)]" and (2) "Defendant Acosta is not entitled to qualified immunity for the force exerted on F.M. as a matter of clearly established law" (capitalization altered)). As a result, A.M. is not situated to claim on appeal that she lacked notice that she should present evidence (as well as legal argument) designed to forestall a potential grant of qualified immunity to Officer Acosta.

To justify her view that she received inadequate notice of a forthcoming qualified-immunity ruling, A.M. relies on a non-precedential order and judgment issued by a panel of this court in 1993. *See Aitson v. Campbell*, 989 F.2d 507, 1993 WL 55951, at *3–4 (10th Cir. Mar. 1, 1993) (unpublished table decision). An issue in *Aitson* was whether the district court erred in dismissing claims in a *sua sponte* grant of *absolute* immunity. Critically, the defendants in that case—members of the Oklahoma Board of Dentistry, who had revoked the plaintiff's professional license—had only sought *qualified* (not absolute) immunity in moving for summary judgment. *See id.* at *3. The panel reversed the district court's judgment; it reasoned that, because none of the briefing

21

discussed absolute immunity, the plaintiff was prejudiced by a lack of notice that the issue was even presented for decision. *See id.* at *4. Those circumstances, however, make *Aitson* distinguishable. Notably, all three summary-judgment briefs concerning Officer Acosta addressed qualified immunity in some way, and that is precisely the kind of immunity that formed the basis for the district court's ruling. Accordingly, we conclude that *Aitson* does not avail A.M., and her reliance on it is misplaced.

Finally, A.M. contends that she was deprived of the opportunity to come forward with evidence of injuries she claims F.M. sustained during the handcuffing. However, our review of the parties' briefing belies this argument. Most saliently, in his response brief, Officer Acosta argued that any injury to F.M. would have been *de minimis*, *see* Aplt.'s App. (14-2183) at 322–23 (Acosta's Resp. Br., filed Jan. 29, 2014) (arguing that F.M.'s minor status did not render Officer Acosta's "minimal use of force unconstitutional" in light of "established precedent requir[ing a] . . . show[ing] [that] the force used resulted in some substantial injury"); this argument should have reasonably apprised A.M. it was necessary to present with her reply brief evidence concerning any physical or emotional injury of F.M. In this regard, our precedent treats "some actual injury" as an essential element of a claim for excessive force under § 1983. *Cortez*, 478 F.3d at 1129 & n.25. A.M. was therefore on notice that she needed to offer any evidence that she possessed regarding F.M.'s injuries from handcuff-

related force applied during the arrest. Bearing the foregoing in mind, we conclude that A.M. is not entitled to reversal on this procedural basis.

In sum, we conclude that A.M. received sufficient warning that the question of qualified immunity would be resolved in the district court's ruling on her motion for summary judgment. And she certainly should have understood that, if the district court resolved the qualified-immunity issue in Officer Acosta's favor, that would effectively end the litigation as to him. We consequently discern no reversible error in the court's method of granting summary judgment to Officer Acosta, the non-moving party.

### 2. Unlawful-Arrest Claim

We now address whether the district court erred in granting qualified immunity to Officer Acosta on A.M.'s claim that he arrested F.M. without probable cause in violation of the Fourth Amendment. For the reasons discussed herein, we conclude (as the district court did) that Officer Acosta is entitled to qualified immunity. Specifically, we affirm the court's judgment on the ground that the extant clearly established law in May 2011 would not have apprised a reasonable law-enforcement officer in Officer Acosta's position that F.M.'s conduct in Ms. Mines-Hornbeck's class fell outside of the scope of N.M. Stat. Ann. § 30-20-13(D), such that there would not have been probable cause to support an arrest of F.M. for interfering with the educational process.

23

## a. Background Principles

### i

"A warrantless arrest violates the Fourth Amendment unless it was supported by probable cause." *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008); *see Romero v. Story*, 672 F.3d 880, 889 (10th Cir. 2012) ("In the context of an unlawful arrest . . . , the law was and is unambiguous: a government official must have probable cause to arrest an individual." (quoting *Fogarty*, 523 F.3d at 1158–59)). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Keylon*, 535 F.3d at 1216 (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).

When assessing whether an officer had probable cause to arrest an individual, courts "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)); *accord Rojas v. Anderson*, 727 F.3d 1000, 1003 n.4 (10th Cir. 2013); *see also Illinois v. Gates*, 462 U.S. 213, 232 (1983) (noting that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules").

"Neither the officer's subjective beliefs nor information gleaned post-hoc bear on this inquiry." *Manzanares v. Higdon*, 575 F.3d 1135, 1144 (10th Cir. 2009). Ultimately, "[a]ll that matters is whether [the officer] possessed knowledge of evidence that would provide probable cause to arrest [the individual] on *some* ground." *Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006).

In the present case, Officer Acosta contends that he had probable cause to arrest F.M. for violating N.M. Stat. Ann. § 30-20-13(D), which provides, in pertinent part: "No person shall willfully interfere with the educational process of any public . . . school by committing, threatening to commit or inciting others to commit any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions of a public . . . school."[5] Officer Acosta alleges that he based his decision to arrest on two factors: (1) Ms. Mines-Hornbeck's statement that F.M.'s (fake) burping and other specified misconduct prevented her from controlling her class, and (2) his observation that, when he responded to Ms. Mines-Hornbeck's call, "there was no more teaching going on," Aplt.'s App. (14-2183) at 289, because Ms. Mines-Hornbeck was monitoring F.M. in the hallway. In sum, Officer Acosta asserts that F.M.'s behavior constituted an

---

[5] As noted above, in full, subsection (D) reads: "No person shall willfully interfere with the educational process of any public or private school by committing, threatening to commit or inciting others to commit any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions of a public or private school." N.M. Stat. Ann. § 30-20-13(D).

25

obvious and willful interference with the educational process—as described by the statute—and that his (Officer Acosta's) recognition of the interference supplied him with the requisite probable cause to arrest F.M.

However, in the qualified-immunity context, Officer Acosta's commission *vel non* of a constitutional violation need not be the focus of our inquiry. This is because A.M. "must demonstrate on the facts alleged *both* that [Officer Acosta] violated [F.M.'s] constitutional . . . rights, *and* that the right was clearly established at the time of the alleged unlawful activity." *Riggins*, 572 F.3d at 1107 (emphases added). We elect to center our analysis on the clearly-established-law question.

"As a practical matter, we implement this [clearly-established-law] standard by asking whether there was 'arguable probable cause' for an arrest—if there was, a defendant is entitled to qualified immunity." *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012) (quoting *Cortez*, 478 F.3d at 1121); *see id.* ("If we conclude that probable cause was lacking, we then must determine whether Mr. Kaufman's rights were clearly established, which we approach by asking whether the officers *arguably* had probable cause."). To be more specific,

> [w]hen a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is "entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest" the plaintiff. "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity."

26

*Romero*, 45 F.3d at 1476 (citations omitted) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 228 (1991) (per curiam)); *see Cortez*, 478 F.3d at 1120 ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."). In other words, in the § 1983 qualified-immunity context, an officer may be mistaken about whether he possesses *actual* probable cause to effect an arrest, so long as the officer's mistake is reasonable—*viz.*, so long as he possesses "arguable probable cause." *Cortez*, 478 F.3d at 1121; *see id.* at 1120 n.15 ("Some courts have referred to this standard as 'arguable probable cause.'"); *accord Koch v. City of Del City*, 660 F.3d 1228, 1241 (10th Cir. 2011); *see also Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) ("Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists."); *Jones v. Cannon*, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry.").

We conclude that A.M. has not demonstrated that, under extant clearly established law, a reasonable officer in Officer Acosta's position would have had fair warning that he lacked probable cause to arrest F.M. for interfering with the educational process in violation of N.M. Stat. Ann. § 30-20-13(D). Put another way, in our view, such an officer could have reasonably believed—even if

27

mistakenly—that the officer possessed probable cause under section 30-20-13(D) to arrest F.M.

**ii.**

At the outset, we note that there are *no* Supreme Court or published Tenth Circuit decisions addressing the contours of probable cause to arrest under New Mexico's interference-with-educational-process statute. But, as we have explained in a case that turned on the interpretation of state law:

> [W]e think it prudent to clarify . . . the role played by *state* law in determining whether Plaintiff can show a violation of . . . *federal* rights. Here, where the context is an alleged [wrongful] arrest for a purported state offense, state law is of inevitable importance. The basic federal constitutional right of freedom from arrest without probable cause is undoubtedly clearly established by federal cases. But the precise scope of that right uniquely *depends on the contours of a state's substantive criminal law* in this case because the Defendants claim to have had probable cause based on a state criminal statute. And as to the interpretation of [that state's] criminal law, other than the statute itself . . . , [that state's] Supreme Court is the ultimate authority. So we look to the [state] Supreme Court's decisions when inquiring whether the Defendants' interpretation of the . . . statute was one that a reasonable officer would have held at the time of [Plaintiff's] arrest.

*Kaufman*, 697 F.3d at 1300–01 (emphases added) (citation omitted) (discussing Colorado's substantive criminal law); *see also Mayfield v. Bethards*, No. 15-3074, --- F.3d ----, 2016 WL 3397503, at *3–5 (10th Cir. June 20, 2016) (looking to Kansas law to define the contours of plaintiffs' Fourth Amendment right to be free from unreasonable seizure of their pet dog); *Wilson v. Montano*, 715 F.3d

28

847, 854 (10th Cir. 2013) (in determining whether the federal constitutional right to a prompt probable-cause determination was violated, noting that "[w]e consider New Mexico state law insofar as it bears on the scope of each appellant's responsibility to ensure a prompt probable cause determination"); *accord Cherrington v. Skeeter*, 344 F.3d 631, 643 (6th Cir. 2003).

When a state Supreme Court has not spoken on the question at issue, we assume (without deciding) that a reasonable officer would seek guidance regarding the scope of proper conduct at least in part from any on-point decisions of the state's intermediate court of appeals. *See* Richard B. Saphire, *Qualified Immunity in Section 1983 Cases and the Role of State Decisional Law*, 35 ARIZ. L. REV. 621, 647 n.123 (1993) ("Where the relevant state court decision is not that of the state supreme court, . . . . a decision by a state appellate court . . . for the judicial district within which a public official works will normally be considered a relevant, and at least a *provisionally binding*, source for determining the legal standards to which the public official should conform." (emphasis added)); *cf. Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1297 (10th Cir. 2010) ("[T]he decision of an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (quoting *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007))).

29

For clarity's sake, however, we underscore that—even when it is essential to discern the content of state law—the rights being vindicated through § 1983 are federal. *See, e.g.*, *Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law."); *Clanton v. Cooper*, 129 F.3d 1147, 1155 n.4 (10th Cir. 1997) ("Clanton also claims that such a statement [i.e., a confession of an admitted coconspirator] may not support an arrest warrant under Oklahoma law. . . . [A]n action may not be maintained under 42 U.S.C. § 1983 for a state official's failure to adhere to state law.").

### b. Clearly-Established-Law Analysis

A.M. insists that Officer Acosta's arrest of F.M. for his burping and other horseplay in Ms. Mines-Hornbeck's classroom violated clearly established law because F.M.'s conduct patently did not rise to the level of seriousness envisioned by N.M. Stat. Ann. § 30-20-13(D) and "no case [was] necessary to alert him [i.e., Officer Acosta] to this fact." Aplt.'s Opening Br. (14-2183) at 40. In this regard, A.M. reasons, "At worst, F.M. was being a class-clown and engaged in behavior that would have subjected generations of school boys to an after-school detention, writing lines, or a call to his parents." *Id.* at 42. Moreover, A.M. contends that, when the provisions of section 30-20-13 are read as a whole, "it is clear that the New Mexico legislature contemplated" that the statute's provisions would only be violated "by actions which impede the overall public function of the school, and

30

not a classroom in the school." Reply Br. (14-2183) at 15; *see* Aplt.'s Opening Br. (14-2183) at 40 ("Any reasonable officer would understand that Section 30-20-13(D) is targeted at criminalizing the intentional act of disrupting the overall operation of a school.").

As germane here, in assessing whether Officer Acosta had fair notice that his conduct would be unlawful in the circumstances he confronted (i.e., when he was deciding whether to arrest F.M.), we are guided, first, by the text of N.M. Stat. Ann. § 30-20-13(D) and, then, by any relevant state and federal decisions interpreting its import.

**i.**

The determination of whether a law-enforcement officer's reliance on a statute makes his conduct objectively reasonable turns, *inter alia*, on "the degree of specificity with which the statute authorized the conduct in question." *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 846 (10th Cir. 2005) (quoting *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1253 (10th Cir. 2003)). And we "resist reading words or elements into a statute that do not appear on its face." *United States v. Handley*, 678 F.3d 1185, 1189 (10th Cir. 2012) (quoting *United States v. Sturm*, 673 F.3d 1274, 1279 (10th Cir. 2012)). So do the New Mexico courts. *See, e.g.*, *State v. Wood*, 875 P.2d 1113, 1116 (N.M. Ct. App. 1994) ("This Court will not read language into a statutory provision which is clear on its face."); *State v. Gutierrez*, 699 P.2d 1078, 1082 (N.M. Ct. App. 1985) ("This

31

interpretation [i.e., the defendant's] requires us to read words into the statute or ignore words that are present. This we need not do, since the statute makes sense as written.").

We believe the text of N.M. Stat. Ann. § 30-20-13(D) manifests the New Mexico legislature's intent to prohibit a wide swath of conduct that interferes with the educational process. The statute renders unlawful, *inter alia*, the commission of "*any* act which would . . . interfere with" or "disrupt" school functioning and, thereby, "interfere with the educational process." N.M. Stat. Ann. § 30-20-13(D) (emphasis added). The common meaning of the word "any" is, *inter alia*, "one or some indiscriminately *of whatever kind*." *Any*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) [hereinafter WEBSTER'S (2002)] (emphasis added); *see id.* (additionally defining the term to mean, *inter alia*, "one, no matter what one" and "some no matter how great or small").[6]

To "interfere" means "to be in opposition: to run at cross-purposes[;] . . . to act . . . so as to . . . diminish," *Interfere*, WEBSTER'S (2002), *supra*; or to "prevent

---

[6] In a variety of contexts, the New Mexico Supreme Court has acknowledged the breadth of the term "any," as employed by the legislature. *See, e.g.*, *Elane Photography, LLC v. Willock*, 309 P.3d 53, 61 (N.M. 2013); *Key v. Chrysler Motors Corp.*, 918 P.2d 350, 355–56 (N.M. 1996); *see also In re Estate of DeLara*, 38 P.3d 198, 201 (N.M. Ct. App. 2001); *accord United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 97 (1976))); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (same); *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1237 (10th Cir. 2014) (same).

(a process or activity) from continuing or being carried out properly," *Interfere*, NEW OXFORD AMERICAN DICTIONARY (2d ed. 2005). *See also Interference*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining the term as meaning, to pose "[a]n obstruction or hindrance"). Similarly, to "disrupt" means "to throw into disorder[;] . . . to interrupt to the extent of stopping, preventing normal continuance of, or destroying[] that experience," *Disrupt*, WEBSTER'S (2002), *supra*; or to "caus[e] a disturbance or problem," *Disrupt*, NEW OXFORD AMERICAN, *supra*.

The ordinary meaning of these statutory terms would seemingly encompass F.M.'s conduct because F.M.'s burping, laughing, and leaning into the classroom stopped the flow of student educational activities, thereby injecting disorder into the learning environment, which worked at cross-purposes with Ms. Mines-Hornbeck's planned teaching tasks. More to the point, we cannot conclude that the plain terms of subsection (D) would have given a reasonable law-enforcement officer in Officer Acosta's shoes fair warning that if he arrested F.M. for engaging in his classroom misconduct he (i.e., the officer) would be violating F.M.'s Fourth Amendment right to be free from an arrest lacking in probable cause.

Though A.M. suggests that the New Mexico legislature only sought to criminalize more serious conduct, there is no such limiting language in subsection (D)'s plain terms, and we decline to read such a limitation into the statute. *See,*

33

*e.g.*, *Handley*, 678 F.3d at 1189; *Wood*, 875 P.2d at 1116. Likewise, we discern no textual support for A.M.'s contention that the statute evinces the legislature's intention to punish the specified acts (e.g., "disrupt, impair, interfere") only when they detrimentally impact "the overall public function of the school, and not a classroom in the school." Reply Br. (14-2183) at 15. And A.M. offers no statutory analysis to bolster her conclusory assertion to this effect.[7]

Accordingly, we do not believe that A.M. can carry her clearly-established-law burden by relying solely on the plain terms of N.M. Stat. Ann. § 30-20-13(D). We acknowledge, however, that when refracted through the lens of judicial decisions, statutory language may conceivably send a warning signal that is not readily apparent on the statute's face. And, in this regard, A.M. maintains that the caselaw extant at the time of F.M.'s arrest supports her view that Officer Acosta lacked probable cause for his arrest of F.M. under section 30-20-13(D).

---

[7] Indeed, it is not clear that A.M.'s own argument would exclude from the ambit of section 30-20-13(D) all misconduct that occurs in the classroom setting. Whether student misconduct impacts the school as a whole seems at least sometimes, in A.M.'s view, to turn less on *where* the misconduct occurs than on whether the misconduct is very serious—e.g., violent or otherwise egregious. In this regard, A.M. contends that "behavior [involving] . . . physical obstruction of a person's lawful movement and the use of force or intimidation" would be covered by subsection (D), Reply Br. (14-2183) at 15—even though such wrongful action could conceivably be directed at individuals in a classroom setting, rather than toward the school as a whole (through, for example, a threat to bomb the school).

The body of relevant caselaw is very limited.[8]  In making its clearly-established-law argument, A.M. principally relies on a decision of the New Mexico Court of Appeals, *State v. Silva*, 525 P.2d 903 (N.M. Ct. App. 1974).  We conclude, however, that *Silva* does not get A.M. over her clearly-established-law hurdle.

*Silva* involved a distant statutory predecessor of N.M. Stat. Ann. § 30-20-13.[9]  Though this earlier statute included some terms that are identical to the

---

[8]     All of the New Mexico state cases during the relevant timeframe involving N.M. Stat. Ann. § 30-20-13 focus on a different statutory subsection than the one at issue here (i.e., subsection (D)).  *See Livingston v. Ewing*, 652 P.2d 235, 239 (N.M. 1982) (discussing a subsection that prohibits the willful failure to leave state-controlled property); *State v. Joyce*, 614 P.2d 30, 31 (N.M. Ct. App. 1980) (same).

[9]     The statute at issue was N.M. Stat. Ann. § 40A-20-10 (1974).  The *Silva* court noted at the outset that the defendants only had standing to challenge subsection (C) of that statute.  *See* 525 P.2d at 905.  That provision read in full:

> No person shall willfully refuse or fail to leave the property of, or any building or other facility owned, operated or controlled by the governing board of any institution of higher education upon being requested to do so by the chief administrative officer or his designee charged with maintaining order on the campus and in its facilities or a dean of a college or university, if the person is committing, threatens to commit or incites others to commit any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions of the institution.

N.M. Stat. Ann. § 40A-20-10(C) (1974).  The statute was substantially rewritten in 1975.  *See* 1975 N.M. Laws, ch. 52, § 2, at 177; *see also* N.M. Stat Ann.

(continued...)

language of subsection (D), the *Silva* statute did not include any provision that specifically proscribed interference with educational process. Instead, the specific provision at issue in *Silva* prohibited any person from

> willfully refus[ing] or fail[ing] to leave the property of, or any building or other facility owned, operated or controlled by the governing board of any institution of higher education upon being requested to do so by the chief administrative officer or his designee . . . if the person is committing, threatens to commit or incites others to commit any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions of the institution.

N.M. Stat. Ann. § 40A-20-10(C) (1974); *see Silva*, 525 P.2d at 905. The defendants were students who refused to leave a university president's office after being twice asked to do so. *See Silva*, 525 P.2d at 904. The president was conducting appointments in his office and voiced the concern that the students were "disrupting *his* normal business." *Id.* (emphasis added). This resulted in the police arresting the students. *See id.*

---

[9](...continued)
§ 40A-20-10, historical note ("The 1975 amendment rewrote this section"). Further, as a result of a comprehensive revision and compilation process commissioned in 1977 by the New Mexico legislature for completion in 1978, *see* 1977 N.M. Laws, ch. 74, § 1, at 227; *see also* N.M. Stat. Ann. pamphlet 1, prelim. matter, at iii (noting that "the statutes were completely reorganized" and that "[t]he complete arrangement of statutes required that new numbers be assigned to each section"), the text of the 1975 version of 40A-20-10 was redesignated—apparently without any material alteration of terms—as N.M. Stat. Ann. § 30-20-13, *see* N.M. Stat. Ann., parallel tables, at 49 (noting that section 40A-20-10 was redesignated in the 1978 compilation at section 30-20-13); *cf. Livingston*, 652 P.2d at 239 (citing the N.M. Session Law that enacted the 1975 version of section 40A-20-20, *see* 1975 N.M. Laws, ch. 52, § 2, at 177, as the originating source of N.M. Stat. Ann. § 30-20-13).

The students challenged the constitutionality of the statute, *inter alia*, on First Amendment overbreadth grounds. *See id.* at 907 ("When a statute draws within its prohibitory ambit conduct protected by the First and Fourteenth Amendments it is void for overbreadth."). But the court rejected this attack, reasoning, as an initial matter, that the statute was actually "more narrowly drawn" than analogous proscriptive statutes that had been upheld in the educational context and that subsection (C) of section 40A-20-10 was "valid on its face." *Id.* at 908. More specifically, as to the statute's narrowly drawn nature, the court reasoned that "[i]ts operative verbs (disrupt, impair (as construed), interfere with, obstruct), read as a whole, denote a more substantial, more physical invasion," than analogous statutes that, to the contrary, are broad enough to punish conduct that merely disturbs the peace. *Id.* at 907. In the same vein, the court held that, unlike such comparatively broader statutes, the statute at issue there (i.e., subsection (C)) "requires interference with the actual functioning of the University," *id.*; it reasoned that the statute's reference to the institution's mission, processes, procedures, and functions, "when read together, mean nothing less," *id.* at 908. In addition, the court ruled that the statute was constitutional as applied, observing, among other things, that when the students' "demands were not met they added coercive conduct to their protected speech and their constitutional protection ended" and, more specifically, that "[b]y refusing to leave" the president's office after he asked them to leave, the students

37

"substantially interfered in the functioning of *the president's business*." *Id.* at 908 (emphasis added).

According to A.M., *Silva* constitutes clearly established law for this case and, in particular, makes clear that N.M. Stat. Ann. § 30-20-13(D) should be interpreted as proscribing only conduct that (a) rises to a level of seriousness akin to that in *Silva*, and (b) detrimentally impacts the actual functioning of a school, as a whole, not just an individual classroom. Therefore, A.M. reasons that *Silva* would have given a reasonable officer in Officer Acosta's position fair warning that he lacked probable cause to arrest F.M. under section 30-20-13(D) for "[a]t worst, . . . being a class-clown" in Ms. Mines-Hornbeck's classroom. Aplt.'s Opening Br. (14-2183) at 42. We disagree.

First of all, it is not even clear that *Silva* is apposite in this factual and legal context—much less clearly established law for it. A.M. has not identified any New Mexico decisions in the relevant time period that have used *Silva* to define the scope of section 30-20-13(D), and we are not aware of any. To be sure, we freely acknowledge that there are similarities between the language of the statute at issue in *Silva* (i.e., section 40A-20-10(C)) and the language of section 30-20-13(D). Notably, in an educational context, both statutes condition liability on an individual's direct or indirect commission of "any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions." N.M. Stat. Ann. § 30-20-13(D). *Compare* N.M. Stat. Ann. § 40A-20-

38

10(C) (1974) (proscribing "any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions").

However, subsection (D) is a unique statute that the New Mexico legislature adopted in 1981 as an amendment to section 30-20-13, *see* 1981 N.M. Laws, ch. 32, § 1, at 107–08, to deal with different concerns than those addressed by the statute at issue in *Silva*—i.e., subsection (C) of section 40A-20-10. The plain language of the two statutes patently reveals this fact. Significantly, the express terms of section 40A-20-10(C) convey that the New Mexico legislature's objective in enacting the statute was to punish those who would willfully engage in a comparatively narrow set of conduct—unauthorized sit-ins and other occupations of property of colleges and other institutions of higher education. *See* N.M. Stat. Ann. § 40A-20-10(C) (punishing any "person [who] shall willfully refuse or fail to leave the property of, or any building or other facility owned, operated or controlled by the governing board of any institution of higher education upon being requested to do so"); *see Silva*, 525 P.2d at 907 (noting that "the statute vindicates the significant government interest in the control of campus disturbances"); *see also* Dan R. Price, Note, *State Legislative Response to Campus Disorder: An Analytical Compendium*, 10 HOUS. L. REV. 930, 938 & n.74 (1972–73) (discussing "campus disorder laws" and noting, with citation to N.M. Stat. Ann. § 40A-20-10, that "[t]he single most popular enactment was a statute that forbade interference or trespass upon notice").

In sharp contrast, the plain terms of section 30-20-13(D) reveal that the proscriptive focus of the New Mexico legislature was broader: it aimed to punish any person who willfully, *inter alia*, disrupts or interferes with a school's "educational process"—without restricting by its terms the form in which that process might manifest itself. *See* N.M. Stat. Ann. § 30-20-13(D) (criminally punishing a "person [who] shall willfully interfere with the educational process of any public or private school"). Notably, though subsection (C) of section 40A-20-10 and subsection (D) of section 30-20-13 use some of the same language, there is no substantive analogue of subsection (D) in any provision of section 40A-20-10. In other words, none of the latter's provisions specifically relates to willful interference with the educational process.

The idea that the substantive concerns of the two statutes are different—which should be clear from their plain terms—becomes even more obvious when one recognizes that another subsection of section 30-20-13—subsection (C)—is substantively analogous to the exact provision at issue in *Silva*—which is also designated subsection (C) (i.e., section 40A-20-10(C)). In other words, there is a provision in section 30-20-13 that addresses subject matter that is similar to the provision at issue in *Silva*. Specifically, like subsection (C) in *Silva*, subsection (C) of section 30-20-13 criminalizes the willful failure to leave certain government property (albeit not just education-related property)

40

"when requested to do so."  N.M. Stat. Ann. § 30-20-13(C).[10]  Given that

subsection (C) of section 30-20-13 generally addresses similar subject matter as

the statute at issue in *Silva*, we doubt that the New Mexico legislature also

intended for subsection (D)—the one at issue here—to address this topic.  The

New Mexico courts presume that the legislature does not act in such a redundant

fashion.  *See, e.g.*, *Katz v. N.M. Dep't of Human Servs.*, 624 P.2d 39, 43 (N.M.

1981) ("A statute must be construed so that no part of the statute is rendered

surplusage or superfluous."); *accord State v. Javier M.*, 33 P.3d 1, 15 (N.M.

2001).

Thus, given that the two statues are focused on different things, we are

hard-pressed to conclude that it would have been pellucid to a reasonable officer

in Officer Acosta's shoes that he should look to *Silva* for direction in seeking to

---

[10]     In full, subsection (C) reads:

> No person shall willfully refuse or fail to leave the property of or
> any building or other facility owned, operated or controlled by
> the state or any of its political subdivisions when requested to do
> so by a lawful custodian of the building, facility or property if
> the person is committing, threatens to commit or incites others to
> commit any act which would disrupt, impair, interfere with or
> obstruct the lawful mission, processes, procedures or functions
> of the property, building or facility.

N.M. Stat. Ann. § 30-20-13(C).  The language of this provision originated in the
1975 version of 40A-20-10, *see supra* note 9; the 1975 version removed the
exclusive focus on institutions of higher learning that was found in the earlier
iteration of section 40A-20-10 that *Silva* addressed.

41

enforce the separate provisions of section 30-20-13(D).[11] Put more broadly, given

the absence of New Mexico authority from the relevant period applying *Silva* to

section 30-20-13(D), and given the distinct legal contexts contemplated by,

respectively, the statute in *Silva* and the one in this case, it is not clear to us that

*Silva* is even apposite—let alone clearly established law. And, if it is not clear to

us, it *a fortiori* would not have been clear to a reasonable officer in Officer

Acosta's position.

Furthermore, even assuming *arguendo* that such a reasonable officer would

have sought guidance from *Silva*, we are not persuaded that *Silva* would have

clearly warned that officer that he lacked probable cause under section 30-20-

---

[11]     Officer Acosta's briefing does not advance an argument based on the differences in sections 40A-20-10(C) and 30-20-13(D). However, it is beyond peradventure that "we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or *even presented to us on appeal*." *Jordan v. U.S. Dep't of Justice*, 668 F.3d 1188, 1200 (10th Cir. 2011) (emphasis added) (quoting *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011)). "[I]t is neither unusual nor unjust for this court" to do this. *United States v. Games-Perez*, 695 F.3d 1104, 1109 (10th Cir. 2012) (en banc) (Murphy, J., concurring in the den. of reh'g en banc). Moreover, such a decisional approach is particularly acceptable and proper when, as here, the matter at issue involves construing the plain terms of statutes—a quintessentially legal undertaking. *See Cox*, 800 F.3d at 1246 n.7 ("[W]e also recognize that we can entertain a defendant's argument on the clearly-established-law prong under certain circumstances, even if the argument had been forfeited in district court, because the issue involves a pure matter of law."); *cf. United States v. Lyons*, 510 F.3d 1225, 1238 (10th Cir. 2007) ("Our discretion allows us to determine an issue raised for the first time on appeal if it is a pure matter of law and its proper resolution is certain."). Put more concretely, the differences between the two statutes are patent; we need not (and do not) ignore them simply because Officer Acosta did not bring them to our attention.

13(D) to arrest F.M.  In this regard, we underscore that A.M. must shoulder a "quite heavy" burden in showing that the law was clearly established by *Silva*. *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996) (quoting *Jantz v. Muci*, 976 F.2d 623, 627 (10th Cir. 1992)); *see also Dodds v. Richardson*, 614 F.3d 1185, 1191 (10th Cir. 2010) ("Once a defendant asserts qualified immunity, the plaintiff bears the burden of satisfying a 'strict two-part test.'" (citation omitted)).  And, more specifically, it is not enough for A.M. to demonstrate that, under *Silva*'s guidance, Officer Acosta lacked probable cause to arrest F.M.  Instead, A.M. must show that Officer Acosta lacked arguable probable cause: *viz.*, his belief that he possessed probable cause was not only mistaken, it was objectively unreasonable.  *See, e.g.*, *Stonecipher*, 759 F.3d at 1141 ("Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists.").  We conclude that A.M. has failed to carry this burden.

First of all, contrary to A.M.'s suggestion, there is nothing in *Silva*'s text that would have put a reasonable officer on notice that only conduct that substantially "mirrors" the degree of seriousness of the students' conduct in *Silva*, Reply Br. (14-2183) at 18, is criminalized by subsection (D).[12]  It is true that

---

[12]      To the contrary, it is worth noting that *Silva*'s reasoning could have led a reasonable officer to believe on these facts he was not obliged to refrain from arresting F.M. for his classroom horseplay just because school authorities had other means of disciplining him, such as "after-school detention, writing

(continued...)

*Silva* describes the students' conduct as "*substantially* interfer[ing] in the functioning of the president's business."  525 P.2d at 908 (emphasis added).  But the court does not purport to limit its holding to wrongful conduct of comparable seriousness.

Relatedly, even if A.M. were correct that a central upshot of *Silva* is that mere disturbances of the peace—as such conduct is understood "in the school context," *id.* at 907—are not punishable under section 30-20-13(D), that would not avail her on these facts.  A reasonable officer in Officer Acosta's shoes, who was taking his cues from *Silva*, could have reasonably believed (even if

---

[12](...continued)
lines, or [placing] a call to his parents."  Aplt.'s Opening Br. (14-2183) at 42.  In rejecting the students' suggestion that their arrests were improper, the *Silva* court reasoned:

> They [i.e., the students] argue that the president was too hasty and could have moved his meeting elsewhere.  There are . . . answers to that argument: First, [the president] had no way of knowing how long they would stay or how many appointments they would disrupt. . . .  [Second], "[i]t may be, as has been suggested, that in these cases of nonviolent violation, there is 'sense in patient forbearance despite the wrong that the action involves.'  Patient forbearance, however, is the result of a prudential judgment and is not constitutionally compelled."

525 P.2d at 908 (third alteration in original) (citation omitted).  Like the university president in *Silva* who called for the students' arrest, a reasonable officer in Officer Acosta's shoes (1) could not have known how long F.M. might continue to provoke his classmates and teacher through his impromptu fake-burping conduct, and (2) was not required—by the statute's plain terms—to exercise extraordinary (or, for that matter, ordinary) "patient forbearance," *id.* (citation omitted), while F.M.'s horseplay caused Ms. Mines-Hornbeck's teaching to come to a grinding halt.

mistakenly) that F.M.'s conduct—though he "was being a class-clown," Aplt.'s Opening Br. (14-2183) at 42—amounted to more than a mere disturbance of the peace in a school setting. In that setting, *Silva* could be reasonably read as suggesting that the bar is quite low for conduct to qualify as a disturbance of the peace. Specifically, the court stated, "Normal conversational speech in an unobstructive or undisruptive situation may yet disturb." *Silva*, 525 P.2d at 907. It logically follows perforce that, comparatively speaking, it would not take much under *Silva* for a student's conduct to constitute more than a disturbance of the peace—that is, to be "a more substantial, more physical invasion," in *Silva*'s words. *Id.* In other words, one might reasonably infer from *Silva* that relatively minor student conduct could exceed the boundaries that define mere disturbances of the peace.

Here, F.M. was not merely speaking in a conversational tone (e.g., voicing a concern or criticism to the teacher or sharing a joke with a fellow student); instead, he was repeatedly fake-burping, laughing, and (later) leaning into the classroom. And the effect of his conduct was not merely to disturb the good order of Ms. Mines-Hornbeck's classroom; rather, it was to bring the activities of that classroom to a grinding halt. In these circumstances, a reasonable officer in Officer Acosta's position, who was guided by *Silva*, could have believed that F.M. was doing more in the school context than disturbing the peace. More to the point, such an officer could have believed—even if mistakenly so—that he

45

possessed probable cause under section 30-20-13(D) to arrest F.M. for interfering with or disrupting the educational process.

Moreover, we have serious doubts whether A.M. is correct in reading *Silva* as conditioning criminal liability under section 30-20-13(D) on a finding that the conduct at issue interfered with the functioning of the school as a whole, rather than a particular classroom of the school. To be sure, in construing the import of the same terms found in section 30-20-13(D) (i.e., "mission, processes, procedures or functions"), *Silva* stated that the statute "requires interference with the actual functioning of the University." 525 P.2d at 907. However, this statement came in the context of *Silva*'s attempt to distinguish the statute at issue (i.e., section 40A-20-10(C)) from analogous statutes that more broadly proscribed conduct that merely disturbed the peace but did not necessarily interfere with school operations. *See id.* In other words, the focus of *Silva* in this passage was arguably on demonstrating that section 40A-20-10(C) requires actual interference—*viz.*, on showing that mere disturbances of the peace are insufficient—not on establishing the proposition that any interference that the statute proscribes must affect the school as a whole.

Indeed, *Silva*'s facts and actual holding tend to belie A.M.'s reading of subsection (D)'s scope of liability. Specifically, in *Silva*, the students were not arrested for disrupting the University's operations as a whole; instead, they were arrested for interfering with the functions of one office—the president's. Before

they were arrested the president specially reported that they were "disrupting *his* normal business." 525 P.2d at 904 (emphasis added); *see id.* at 908 (noting that "[b]y refusing to leave" the president's office after he asked them to leave, the students "substantially interfered in the functioning of *the president's business*" (emphasis added)). Therefore, insofar as a reasonable officer in Officer Acosta's position was looking to *Silva* for guidance, he could have reasoned that, to the extent that F.M.'s conduct in the classroom interfered with Ms. Mines-Hornbeck's teaching activities, F.M. could be held criminally liable under section 30-20-13(D), just as the students in the president's office in *Silva* were criminally liable for interfering with the president's business activities.[13]

Our conclusion that *Silva* might be reasonably read as not condemning the conduct of a reasonable officer in Officer Acosta's position, is fortified by a 2013 federal district court decision construing the terms of N.M. Stat. Ann. § 30-20-13(D). *See G.M. ex rel. B.M. v. Casalduc*, 982 F. Supp. 2d 1235, 1240 (D.N.M. 2013). We permissibly seek guidance from *Casalduc* regarding the clearly-established-law question, even though it post-dates the arrest at issue here. *See, e.g.*, *Swanson v. Town of Mountain View*, 577 F.3d 1196, 1200 (10th Cir. 2009)

---

[13] In any event, it is not readily apparent to us why a student whose conduct disrupts and interferes with the educational processes of a classroom should not be deemed to have impaired, in A.M.'s words, "the overall public function of the school," Reply Br. (14-2183) at 15—*viz.*, disrupted or interfered with the school's ability to carry out its overall functions and mission, in particular, with respect to the other students in the offending student's classroom.

("[C]ases published *before* the incident govern our analysis. But we also examine cases published *after* the conduct in question to the extent they shed light on the fact that the law was *not* clearly established at the relevant time." (emphases added) (citation omitted)). Specifically, in *Casalduc*, the dispositive issue—akin to the one at issue here—was the propriety of awarding qualified immunity to a school resource officer who arrested a middle-school student under N.M. Stat. Ann. § 30-20-13(D) for sending text messages during class. Like F.M., the *Casalduc* student ignored numerous requests to discontinue her behavior. As a result, "her teacher stopped class to address [the situation]." *Casalduc*, 982 F. Supp. 2d at 1240.

The district court determined that the student's recalcitrant "conduct d[id] not clearly fall outside the conduct prohibited by the plain language of the statute" not only because the student had "ignored numerous requests to stop texting during class," but also because, "[u]nable to continue instruction, her teacher stopped class and eventually summoned [assistance]." *Id.* at 1243. Additionally, as relevant here, the court opined that a reasonable officer, guided by *Silva*, could justifiably have believed that willful text-messaging could provide probable cause to arrest under section 30-20-13(D). More specifically, the court stated: "Assuming that a reasonable officer would be aware of *Silva*, a case from almost forty years ago interpreting a precursor statute, . . . a reasonable officer could conclude that [the student's] conduct substantially interfered with school

48

functions." *Id.* at 1244. The court thus readily concluded that the student's right to be free from arrest was *not* clearly established, and it granted qualified immunity to the school resource officer. The reasoning of *Casalduc* is cogent, and we believe it underscores the correctness of our conclusion that *Silva* would not have given a reasonable officer in Officer Acosta's position fair warning that his conduct was unconstitutional.

In sum, if a reasonable officer in Officer Acosta's shoes had sought guidance from *Silva*, we do not believe that it would have given the officer fair warning that, if he elected to arrest F.M., he would be doing so without probable cause in violation of F.M.'s Fourth Amendment rights. Put another way, even if *Silva* was the controlling touchstone, Officer Acosta's belief that he had probable cause to arrest F.M. under section 30-20-13(D) was objectively reasonable—even if mistaken. Therefore, we conclude that A.M. cannot satisfy her clearly-established-law burden by relying on *Silva*.

We recognize, however, that A.M.'s brief does not limit its caselaw-based argument to *Silva*. Recognizing the paucity of New Mexico caselaw addressing N.M. Stat. Ann. § 30-20-13(D), A.M. contends that judicial decisions from three other states—Colorado, Florida, and North Carolina—interpreting similar laws[14] should have apprised a reasonable officer in Officer Acosta's shoes that he lacked

---

[14] *See* Colo. Rev. Stat. Ann. § 18-9-109(2); Fla. Stat. Ann. § 877.13(1); N.C. Gen. Stat. Ann. § 14-288.4(a)(6).

49

probable cause to arrest F.M. In particular, she reasons that these cases "have made common sense distinctions between school-wide threats and instances similar to burping in class," Aplt.'s Opening Br. (14-2183) at 43, and "[t]hese cases highlight the unreasonableness of Defendant Acosta's determination that F.M.'s actions merited arrest for disrupting the functioning of [CMS]," *id.* at 45.

However, even assuming *arguendo* that the decisions A.M. cites—which appear to be only from intermediate appellate courts—represent the controlling law of their respective states, A.M. has not persuaded us that we should view such a limited universe of caselaw as reflecting a "robust 'consensus of cases of persuasive authority' . . . that would alter our analysis of the qualified immunity question." *Plumhoff v. Rickard*, --- U.S. ----, 134 S. Ct. 2012, 2023 (2014) (citation omitted) (quoting *al-Kidd*, 563 U.S. at 741); *see also Quinn*, 780 F.3d at 1005 (noting that, absent controlling law from the Supreme Court or the Tenth Circuit, a plaintiff may still satisfy the clearly-established-law burden by showing that "the clearly established weight of authority from other courts . . . ha[s] found the law to be as [she] maintains" (quoting *Weise*, 593 F.3d at 1167)). Accordingly, we conclude that A.M. cannot carry her clearly-established-law burden by relying on these cases.

In sum, we hold that it would not have been clear to a reasonable officer in Officer Acosta's position that his arrest of F.M. under N.M. Stat. Ann. § 30-20-13(D) would have been lacking in probable cause and thus violative of F.M.'s

50

Fourth Amendment rights.  In other words, Officer Acosta's belief that he had probable cause to arrest F.M. under section 30-20-13(D) was objectively reasonable—even if mistaken—and, therefore, the district court correctly determined that Officer Acosta is entitled to qualified immunity on A.M.'s Fourth Amendment claim.[15]

---

[15]   We are neither oblivious nor unsympathetic to "the potential future consequences to [a] child," such as F.M., of an arrest or other law-enforcement sanction for seemingly non-egregious classroom misconduct; such a law-enforcement response could potentially have a "far-reaching impact" on a child's ability to lead a productive life.  *Hawker v. Sandy City Corp.*, 774 F.3d 1243, 1244 (10th Cir. 2014) (Lucero, J., concurring); *see* Udi Ofer, *Criminalizing the Classroom: The Rise of Aggressive Policing and Zero Tolerance Discipline in New York City Public Schools*, 56 N.Y.L. SCH. L. REV. 1373, 1375 (2011/2012) ("The growing reliance by schools on policing tactics . . . to address misbehavior on its own raises significant concerns.  But it is even more disconcerting given the availability of proven alternatives to securing the school environment that avoid the collateral consequences resulting from arrests and school removals."); *Police in Schools: Arresting Developments*, THE ECONOMIST, Jan. 9, 2016 ("[T]hose who become entangled in the justice system are likely to remain so.  The opening of a juvenile criminal record—which may not be scrubbed clean until the age of 21—is an augury of further arrests, further convictions and eventual imprisonment, a spiral known to researchers as the 'school-to-prison-pipeline.'").  Yet, it is beyond cavil that "[t]he *States* possess primary authority for defining and enforcing the criminal law."  *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) (emphasis added) (citation omitted); *see generally Bushco v. Shurtleff*, 729 F.3d 1294, 1304–05 (10th Cir. 2013) (discussing states' traditional police power when addressing Utah's sexual-solicitation statutory framework).  It ultimately is not our place to question or undermine the New Mexico legislature's policy choice to criminalize interference with the educational process and, more specifically, to (at least arguably) proscribe the kind of classroom misconduct that led to F.M.'s arrest.

### 3. Excessive-Force Claim

A.M. also contends that Officer Acosta, by handcuffing F.M. before driving him to the detention center, violated F.M.'s clearly established Fourth Amendment right to be free from an excessively forceful arrest. The district court resolved this claim on the first prong of our qualified-immunity test: it determined that A.M. had not shown that Officer Acosta committed a constitutional violation. Although we agree with the district court's ultimate disposition regarding the excessive-force claim—*viz.*, we conclude that the court properly awarded qualified immunity to Officer Acosta—we expressly ground our decision on the *second* prong of the qualified-immunity rubric. Specifically, we conclude that the clearly established law in existence in May 2011 would not have apprised a reasonable police officer similarly situated to Officer Acosta that he could be held liable under § 1983 for a Fourth Amendment violation based on handcuffing a minor pursuant to a lawful arrest.

### a. Background Principles

Under well-settled Supreme Court precedent, a law-enforcement officer's "right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion . . . to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *accord Muehler v. Mena*, 544 U.S. 93, 99 (2005). Nonetheless, "[t]he degree of physical coercion that law enforcement officers may use is not unlimited," *Cortez*, 478 F.3d at 1125, and must comport with the Fourth

Amendment. Indeed, "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395. A plaintiff who successfully demonstrates that an officer "used greater force than would have been reasonably necessary to effect a lawful arrest[] [may be] entitled to damages resulting from that excessive force." *Cortez*, 478 F.3d at 1127.

We assay a plaintiff's excessive-force claim for objective reasonableness, asking "whether the officer['s] actions [were] objectively reasonable in light of the facts and circumstances confronting [him], without regard to underlying intent or motivation." *Weigel*, 544 F.3d at 1151 (quoting *Graham*, 490 U.S. at 388); *see also Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1194 (10th Cir. 2001) ("The whole course of conduct of an officer in making an arrest or other seizure . . . must be evaluated for Fourth Amendment reasonableness in light of the totality of the circumstances."). Guided by *Graham*, we consider factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Casey*, 509 F.3d at 1281 (quoting *Graham*, 490 U.S. at 396). Further, the Supreme Court has said that "for the most part *per se* rules are inappropriate in the Fourth Amendment context." *United States v. Drayton*, 536 U.S. 194, 201 (2002).

Thus, when a defendant asserts the defense of qualified immunity in response to a plaintiff's excessive-force claim, the "plaintiff is required to show that the force used was impermissible (a constitutional violation) *and* that objectively reasonable officers could not have not thought the force constitutionally permissible (violates clearly established law)." *Cortez*, 478 F.3d at 1128 (emphasis added). As regards the first requirement—concerning the commission *vel non* of a Fourth Amendment violation—we have said that "our precedent requires a showing in a handcuffing case of an actual, non-de minimis physical, emotional, or dignitary injury to succeed on a claim." *Fisher v. City of Las Cruces*, 584 F.3d 888, 899 (10th Cir. 2009); *accord Koch*, 660 F.3d at 1247. This is because "[h]andcuffing claims, in essence, concern the manner or course in which a petitioner is handcuffed," and "[b]ecause handcuffing itself is not necessarily an excessive use of force in connection with an arrest." *Fisher*, 584 F.3d at 897.

### b.  Clearly Established Law

At summary judgment, the district court rejected A.M.'s excessive-force claim on the first prong of the qualified-immunity standard after finding that she "ha[d] not produced evidence that F.M. suffered an actual physical or emotional injury" stemming from Officer Acosta's use of handcuffs. Aplt.'s App. (14-2183) at 397. The court opined that "*nowhere* in the summary judgment evidence [wa]s there actual evidence that F.M. suffered *any* . . . trauma, much less any . . . above

54

the *de minimis* level." *Id.* (first and second emphases added). In other words, the district court based its ruling on the first prong of the qualified-immunity standard—determining that A.M. failed to demonstrate that Officer Acosta's conduct effected a constitutional violation. A.M. now contends that the court erred not only by failing to find a constitutional violation, but also by failing to realize that then-extant clearly established law should have notified Officer Acosta that he could not handcuff F.M. before transporting him to the detention center. We elect to reach only the clearly-established-law question—that is, the second prong of the qualified-immunity standard. On this alternative ground,[16] we conclude that A.M.'s claim fails because there was *no* clearly established law indicating that F.M.'s minor status could negate Officer Acosta's customary right to place an arrestee in handcuffs during the arrest.

### i. A.M.'s Proffered Clearly Established Law

A.M. shoulders the responsibility in the first instance "of citing to us what [she] thinks constitutes clearly established law" for purposes of this claim. *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010). A.M. first relies upon the Supreme Court's holding in *Graham* as the applicable clearly established law,

---

[16] *See Panagoulakos*, 741 F.3d at 1129; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) (observing "the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct '[even if] the lower court relied upon a wrong ground or gave a wrong reason'" (quoting *Helvering v. Gowran*, 302 U.S. 238, 245 (1937))); *Richison*, 634 F.3d at 1130 (noting our prerogative to "affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court").

arguing: "Applying the *Graham* factors to this case, there was no need to handcuff and transport F.M. to the Detention Center."  Aplt.'s Opening Br. (14-2183) at 52.  We are constrained to reject her proffer of *Graham* for this purpose.

*Graham*, though certainly an excessive-force lodestar, provides no guidance concerning whether an officer, when effecting an arrest supported by probable cause, must refrain from using handcuffs because the arrestee is a minor (lest he open himself up to potential § 1983 liability).  *See, e.g.*, *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664–65 (10th Cir. 2010) (explaining that *Graham* speaks to the *court's* duty to balance individuals' Fourth Amendment rights against countervailing state interests); *Casey*, 509 F.3d at 1281–82 (invoking *Graham* in terms of overall objective reasonableness in light of a particular case's circumstances).  Consequently, *Graham* does not satisfy A.M.'s clearly-established-law burden because it defines the right at issue at an impermissibly "high level of generality."  *al-Kidd*, 563 U.S. at 742.  Insofar as *Graham* applies here, it merely instructs us regarding "general principles of the Fourth Amendment"—that is, overarching concepts that the Supreme Court has said do "not [render] obvious . . . that the conduct of the officer[] in this case violated the Amendment."  *Wilson v. Layne*, 526 U.S. 603, 615–16 (1999).[17]

---

[17]     As we noted *supra* in Part II, in conducting a clearly-established-law analysis, this circuit uses a sliding-scale approach that demands less specificity in the clearly established law the more egregious the conduct that effects the constitutional violation.  In other words, the latter (i.e., the egregiousness of the
(continued...)

The only other source of law that A.M. insists would have given Officer

Acosta fair warning that F.M.'s minor-child status negated his customary right to

place an arrestee in handcuffs is a New Mexico statute governing "[c]riteria for

detention of children."  N.M. Stat. Ann. § 32A-2-11.  The specific statutory

provision on which she relies states that:

> a child taken into custody for an alleged delinquent act shall not be placed in detention unless a detention risk assessment instrument is completed and a determination is made that the child:
>
> (1) poses a substantial risk of harm to himself;
> (2) poses a substantial risk of harm to others; or
> (3) has demonstrated that he may leave the jurisdiction of the court.

---

[17](...continued)
conduct) is in inverse relationship with the former (i.e., the specificity of the clearly established law).  Under such an approach, we do not gainsay that, under certain circumstances where the excessive force is of a particularly egregious nature (e.g., an incredibly reckless taking of a human life by a law-enforcement officer), *Graham* or little more may qualify as the clearly established law that defeats a qualified-immunity defense.  *See Pauly v. White*, 814 F.3d 1060, 1075 (10th Cir. 2016) ("Thus, when an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law." (quoting *Casey*, 509 F.3d at 1284)), *pet. for cert. filed* (U.S. July 11, 2016) (No. 16-67); *see also Browder v. City of Albuquerque*, 787 F.3d 1076, 1083 (10th Cir. 2015) (noting that hardly any caselaw specificity was necessary in our clearly-established-law inquiry because the appeal involved a deadly motor-vehicle accident where the officer was "speeding on [his] own business").  It would border on the fatuous, however, for A.M. to suggest that Officer Acosta's treatment of F.M.—notably, his handcuffing of him—constitutes one of those rare instances of egregious conduct where *Graham*, alone, would be a sufficient source of clearly established law.

*Id.* § 32A-2-11(A). In our view, the statute does not support A.M.'s argument by its plain terms. It patently contemplates the situation that was confronted by the detention-center employees after F.M.'s arrival—i.e., whether to admit F.M. or release him to the custody of his mother—but *not* the situation confronted by Officer Acosta—i.e., whether to transport F.M. to the center with or without restraints. *See, e.g.*, *State v. Steven B.*, 94 P.3d 854, 862 (N.M. Ct. App. 2004) ("[The minor] objected . . . that failure to turn in paperwork did not meet the criteria for detention. The criteria for detention under Section 32A–2–11, however, is applicable *before disposition*; [the minor] was already on probation." (emphasis added)); *cf. State v. Anthony M.*, 958 P.2d 107, 109–10 (N.M. Ct. App. 1998) ("The State cites this statute [section 32A-2-11(A)] for the proposition that Child could not be detained at the Boys' School pending court hearing on the second delinquency petition. . . . We agree with Child that this statute does not preclude detention at the Boys' School. The purpose of the confinement determines whether a child is in detention or commitment at the Boys' School."). In other words, the statute clearly cannot be read as announcing any limitations on an arresting officer's traditional right to place an arrestee in handcuffs. Indeed, as of May 2011, none of the extant New Mexico cases interpreting this statute implicated the issue of handcuffing a minor pursuant to a lawful arrest.

At bottom, A.M. asks us to impute to Officer Acosta awareness that N.M. Stat. Ann. § 32A-2-11(A) would have required him to consider factors related to a

58

hypothetical detention-center placement before handcuffing F.M. in an arrest supported by probable cause. This we cannot do: no court has found that N.M. Stat. Ann. § 32A-2-11(A) imposes a requirement of that nature on officers effecting lawful arrests and the plain terms of the statute do not evince such a command. Furthermore, we likewise cannot conclude that any such requirement would be grounded in the Fourth Amendment. *See, e.g.*, *United States v. Gonzales*, 535 F.3d 1174, 1182 (10th Cir. 2008) ("[W]e have indicated that compliance with state [statutes] may be relevant to our Fourth Amendment reasonableness analysis, [but] we have never held it to be determinative of the constitutionality of police conduct."). Therefore, the statute is *far* from being clearly established law for our purposes.

### ii. Our Survey of the Law

Because neither of A.M.'s cited sources can serve as the extant clearly established law governing her excessive-force claim, "we could hold that [A.M.] has not properly laid the groundwork to defeat [Officer Acosta's] assertion of qualified immunity." *Cox*, 800 F.3d at 1247. Nonetheless, we have taken the additional step of surveying the caselaw extant at the time of the arrest that *would* have guided Officer Acosta's "endeavors to conform his . . . conduct to constitutional norms." *Id.* We have determined that the applicable clearly established law in May 2011 would not have apprised a reasonable officer similarly situated to Officer Acosta that handcuffing F.M. would run afoul of the

Fourth Amendment's prohibition on excessive force. We thus conclude that A.M. has failed to satisfy her burden on the clearly-established-law prong of the qualified-immunity standard. Officer Acosta is entitled to qualified immunity on A.M.'s excessive-force claim.

Because A.M. has intimated that F.M.'s handcuffing was a humiliating experience, we first address the Supreme Court's decision in *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001). There, the Court addressed whether an "inconvenient and embarrassing" arrest for various motor-vehicle violations, and the officer's concomitant handcuffing of the arrestee (an adult), flouted constitutional norms. *Id.* at 355. The officer yelled at the arrestee, "said that he had 'heard [the arrestee's] story two-hundred times,'" *id.* at 324 (citation omitted), and handcuffed the arrestee before placing her in a patrol car. On that set of facts, the Court concluded that the arrest was not "made in an 'extraordinary manner, unusually harmful to [the arrestee's] privacy or . . . physical interests.'" *Id.* at 354 (omission in original) (quoting *Whren v. United States*, 517 U.S. 806, 818 (1996)). The Court explained:

> [The] arrest was surely humiliating, . . . but it was no more harmful to . . . privacy or . . . physical interests than the normal custodial arrest. She was handcuffed, placed in a squad car, and taken to the local police station . . . [, which was] inconvenient and embarrassing to [her], but not so extraordinary as to violate the Fourth Amendment.

*Id.* at 354–55 (second and third omissions in original) (quotations omitted).

60

We have interpreted the substance of *Atwater* as an endorsement of an officer's right to use handcuffs when conducting an otherwise legally proper arrest. In *Cortez*, for instance, we "ha[d] little difficulty concluding that a small amount of force, like grabbing [the plaintiff] and placing him in the patrol car, [wa]s permissible in effecting an arrest under the Fourth Amendment." 478 F.3d at 1128 (citing *Atwater*, 532 U.S. at 354–55). We then characterized *Atwater* as instructing that, standing alone, embarrassment associated with handcuffing during a lawful arrest cannot support an actionable excessive-force claim. *See id.* Similarly, in *Petersen v. Farnsworth*, after noting that the arrestees "did not have [significant] security concerns," we unequivocally read *Atwater* as "establish[ing] that defendants charged with non-violent and non-jailable crimes do not enjoy a constitutional right to be free from all restraints." 371 F.3d 1219, 1223 (10th Cir. 2004). In light of these post-*Atwater* decisions, we confidently conclude here that a reasonable officer in Officer Acosta's position would have understood *Atwater*'s general acceptance of handcuffing incident to a lawful arrest to indicate that, in the ordinary course, handcuffing any arrestee—absent some injury specifically caused by the application of the cuffs—is lawful.

Our holding in *Fisher* is congruent with this conclusion. There, in assessing the "manner or course in which [the plaintiff] [wa]s handcuffed," *Fisher*, 584 F.3d at 897, we stated that "in nearly every situation where an arrest is authorized, or police reasonably believe public safety requires physical

61

restraint, handcuffing is appropriate," *id.* at 896. And we underscored that "in handcuffing cases, a plaintiff must establish some non-de minimis actual injury." *Id.* at 898. Put succinctly, *Fisher* lends support to our view that the right A.M. asserts on F.M.'s behalf—a minor's freedom from restraint during a constitutionally sound arrest—was not clearly established in May 2011.

Of course, we recognize that neither *Atwater* nor *Fisher* involved the distinguishable, critical factor of minor-child status. However, it appears that no subsequent published Tenth Circuit decision has taken that variable into consideration in the excessive-force calculus. But we note a recent observation of a panel of this court, in an unpublished order and judgment, that it "ha[d] uncovered *no case law* (and the parties cite[d] to none) applying a different standard when the victim of the alleged excessive force is a minor." *Hawker v. Sandy City Corp.*, 591 F. App'x 669, 674 n.8 (10th Cir. 2014) (emphasis added).

Along these same lines, we have not uncovered any cases extant at the time of F.M.'s arrest that describe the state of the law and the right at issue as A.M. does. In fact, our study of the relevant caselaw cuts against any reasonable conclusion that a minor's purported right to avoid handcuffing during a lawful arrest was clearly established in May 2011. *See Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1155–56 (D.C. Cir. 2004) (noting, in a case involving the handcuffing of a twelve-year-old girl, where the officer had probable cause to arrest: "the right at issue in this case is the right of

62

freedom of movement when there is probable cause for arrest. . . . [T]his

definition does not depend on the challenged classification—minority

status—itself. . . . The law of this land does not recognize a fundamental right to

freedom of movement when there is probable cause for arrest." (citations

omitted)); *cf. Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1305–07 (11th Cir.

2006) (deeming it unreasonable to handcuff a nine-year-old student who had

cooperated with officers and was not engaging in further disruptive behavior, but

noting: "Deputy Bostic's purpose in handcuffing [the child] was simply to punish

her and teach her a lesson. Every reasonable officer would have known that

handcuffing a compliant nine-year-old child *for purely punitive purposes* is

unreasonable." (emphasis added)). And a number of legal commentators have

likewise concluded—though many have lodged vociferous objections in doing

so—that restraining minors during arrest procedures is commonplace in many

jurisdictions.[18] In light of the foregoing analysis, we are unwilling to conclude

---

[18]     *See, e.g.*, Kim M. McLaurin, *Children in Chains: Indiscriminate Shackling of Juveniles*, 38 WASH. U. J.L. & POL'Y 213, 232 (2012) ("Despite the many constitutional and ethical arguments against the blanket use of shackles [i.e., handcuffs or leg irons] on juveniles without any showing of need, most states continue to do so [on] a daily basis."); Ofer, *supra*, at 1376–77 (observing that "stories of children getting . . . handcuffed" "now appear regularly in the media"); Bernard P. Perlmutter, *"Unchain the Children": Gault, Therapeutic Jurisprudence, and Shackling*, 9 BARRY L. REV. 1, 6 (2007) ("Throughout Florida, juveniles in secure detention routinely appear before judges wearing metal handcuffs . . . regardless of age . . . or alleged offense."); Ira P. Robbins, *Kidnapping Incorporated: The Unregulated Youth-Transportation Industry and the Potential for Abuse*, 51 AM. CRIM. L. REV. 563, 585 (2014) ("At the state

(continued...)

that Officer Acosta could have had fair warning that his conduct during F.M.'s arrest would have constituted a Fourth Amendment excessive-force violation.

In short, we hold that the then-extant clearly established law would not have apprised a reasonable officer in Officer Acosta's position that F.M.'s minor-child status should have negated his time-honored right to use handcuffs in effecting F.M.'s arrest. For these reasons, we conclude that the district court correctly awarded qualified immunity to Officer Acosta on this Fourth Amendment claim.

---

[18](...continued) level, the standards for the transportation of juvenile offenders vary. . . . The regulations in Cincinnati, Ohio contain the uncommon requirement that all juveniles 'remain handcuffed during all phases of transportation and processing.'" (citation and footnote omitted)); *cf.* Gabe Newland, Comment, *A Solution to Michigan's Child Shackling Problem*, 112 MICH. L. REV. FIRST IMPRESSIONS 161, 168–70 (2014) (noting that many states, including New Mexico, are developing a presumption against shackling (which includes handcuffing) children appearing *in court*).

## B. Claims Against Ms. Holmes[19]

Next, we address A.M.'s claims against Ms. Holmes alleging violations of the Fourth, First, and Fourteenth Amendments. The district court awarded summary judgment on qualified-immunity grounds to Ms. Holmes on all of these claims. We conclude that it was correct in doing so. We acknowledge that the district court also ruled against A.M. on her Fourth Amendment claim on collateral-estoppel grounds, in light of the court's prior resolution of A.M.'s Fourth Amendment claim against Ms. LaBarge. However, because we uphold on the merits the district court's qualified-immunity determinations involving Ms. Holmes—including its ruling on the Fourth Amendment claim—we need not (and therefore do not) opine on the correctness of the district court's collateral-estoppel resolution of A.M.'s Fourth Amendment claim against Ms. Holmes.

### 1. Unreasonable-Search Claim

A.M. first contends with respect to Ms. Holmes that "the district court erred in finding that F.M.'s Fourth Amendment rights were not clearly established"

---

[19] We note that A.M. provides her Fourth Amendment unreasonable-search arguments in her opening brief in the Holmes appeal, even though the district court only reached the merits of this claim in ruling on *Ms. LaBarge's* summary-judgment motion. A.M.'s briefing approach is presumably explained by the fact that, in the Holmes appeal, she challenges the court's collateral-estoppel ruling (wherein the court viewed the LaBarge matter as the "prior action") before arguing alternatively that the court improperly awarded qualified immunity to Ms. Holmes on her Fourth Amendment unreasonable-search claim. In her opening brief in the LaBarge appeal, A.M. incorporates and adopts her (Holmes) unreasonable-search arguments by reference.

under extant caselaw as of November 8, 2011 (the date of the in-school search). Aplt.'s Opening Br. (14-2066) at 32 (capitalization altered). Although the district court did base this aspect of its ruling on its determination that any constitutional right would not have been clearly established, in the exercise of our discretion, *see Panagoulakos*, 741 F.3d at 1129, we elect to resolve the issue on the first prong of the qualified-immunity standard. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) ("[W]e may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court . . . ."). We conclude that the court correctly granted qualified immunity to Ms. Holmes on the unreasonable-search claim because, on A.M.'s version of the facts (insofar as they are borne out by the record), the search of F.M. was supported by reasonable suspicion. Thus, we rest our affirmance regarding this claim on our specific conclusion that A.M. has failed to carry her burden of demonstrating that Ms. Holmes committed a Fourth Amendment violation.

Among other rights, the Fourth Amendment safeguards individuals' "right . . . to be secure in their persons . . . and effects[] against unreasonable searches." U.S. Const. amend. IV. "The Fourth Amendment 'requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.'"[20] *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th

---

[20] Usually, the analytical touchstone in our Fourth Amendment unlawful-search cases is twofold: "we first consider whether there was an

(continued...)

66

Cir. 2008) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).  It is presently

"understood to apply within the school setting, and it is not limited to actions

taken for law enforcement purposes."  *Couture v. Bd. of Educ. of Albuquerque

Pub. Schs.*, 535 F.3d 1243, 1250 (10th Cir. 2008).

     "With limited exceptions, a search . . . requires either a warrant or probable

cause."  *Narotzky v. Natrona Cty. Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 567

(10th Cir. 2010) (citing *Camara v. Mun. Ct.*, 387 U.S. 523, 528–29 (1967)); *see

Safford*, 557 U.S. at 369 ("The Fourth Amendment [protection] . . . against

unreasonable searches . . . generally requires . . . probable cause for conducting a

search." (citation and quotations omitted)).  One such exception applies in this

case—for, as the Supreme Court has specifically noted, "[t]he warrant

requirement . . . is unsuited to the school environment."  *T.L.O.*, 469 U.S. at 340;

*accord Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1203–04 (10th Cir.

2006).  The Court has determined that this is so because "[a]lthough the

underlying command of the Fourth Amendment is always that searches . . . be

reasonable, what is reasonable depends on the context within which a search takes

place."  *T.L.O.*, 469 U.S. at 337.  Likewise, the Court has expressly recognized

"that the school setting 'requires some modification of the level of suspicion of

_____

[20](...continued)
expectation of privacy in the area searched.  If so, we . . . determine whether the
search was [objectively] reasonable under the circumstances."  *Narotzky v.
Natrona Cty. Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 567 (10th Cir. 2010).

illicit activity needed to justify a search,'" *Safford*, 557 U.S. at 370 (quoting

*T.L.O.*, 469 U.S. at 340)—*viz.*, in-school searches do not require a predicate

finding of probable cause.

The *New Jersey v. T.L.O.* Court thus held that "the accommodation of the

privacy interests of schoolchildren with [administrators'] substantial need . . . to

maintain order in the schools does not require strict adherence to the requirement

that searches be based on probable cause" and that "the legality of a search of a

student should depend simply on the reasonableness, under all the circumstances,

of the search." 469 U.S. at 341. As the Court has explained more recently, "[t]he

lesser standard for school searches could as readily be described as a moderate

chance of finding evidence of wrongdoing." *Safford*, 557 U.S. at 371. We have

understood these holdings to mean that a school search "need only be [1]

'justified at its inception' and [2] 'reasonably related in scope to the

circumstances which justified the interference in the first place.'" *Couture*, 535

F.3d at 1250 (quoting *Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989)); *see*

*also Jones v. Hunt*, 410 F.3d 1221, 1229 (10th Cir. 2005) (observing that a state

defendant in a school search or seizure is "scrutinized under the minimal

requirements of *Terry* [*v. Ohio*, 392 U.S. 1 (1968)]").

### a. Justified at Inception

*T.L.O.* makes clear that ordinarily "a search of a student by a . . . school

official will be 'justified at its inception' when there are reasonable grounds for

suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." 469 U.S. at 341–42 (footnote omitted). The official need not possess absolute certainty that a search will produce such evidence; rather, "sufficient probability . . . is the touchstone of reasonableness" in the school-search context. *Id.* at 346 (quoting *Hill v. California*, 401 U.S. 797, 804 (1971)).

A.M. asserts that the search of F.M. was not justified at its inception due to "the absence of any particularized evidence pointing to possession of drugs on the person of F.M." Aplt.'s Opening Br. (14-2066) at 34. We disagree. In fact, the record clearly bespeaks Ms. Holmes's awareness of a considerable quantum of particularized evidence when she initiated the challenged search. A student anonymously reported seeing F.M. participating in a suspected drug transaction on school grounds. It would have been reasonable for Ms. Holmes to take this report seriously, given CMS's apparently ongoing problem of student drug-trafficking. In this regard, Officer Acosta confirmed not only that CMS had "a lot of issues with drugs," but also that he had made several in-school arrests related to marijuana. Aplt.'s App. (14-2066) at 117.

Acting on the student report, Ms. Holmes perused security-camera footage depicting the time and location provided by the reporting student. Ms. Holmes's review bolstered the student's "tip": she saw F.M. standing in a closed circle of students—apparently holding a roll of money and passing something to other

students in the cohort. In light of her observations, she summoned the students depicted in the video to the administrative office. Interviewing and searching F.M.'s four identified peers revealed the following: two students said they had seen *someone* with marijuana at school that day; another student said F.M. was carrying cash; and at least three students said that the "circle" incident involved marijuana. Guided by the relaxed standard of *T.L.O.*, we are satisfied that this information suggested a reasonable probability that marijuana (or evidence of other illegal-drug possession or distribution) might be found by searching the fifth student involved, F.M.[21]  *T.L.O.* only requires "*reasonable* grounds" for believing that a search will unearth evidence of wrongdoing, 469 U.S. at 342 (emphasis added), and in this case the foregoing evidence, taken together, rendered sufficiently reasonable the expectation that evidence of rule violations might be found in a search of F.M.

A.M. also urges us to accord the initial tip of a suspected drug transaction less credence because of the reporting student's anonymity. However, the student was *not* entirely anonymous; he or she was merely unknown to F.M. and A.M. Because the teacher who relayed the tip to Ms. Holmes *was* aware of the student's

---

[21]    We are not persuaded by A.M.'s suggestion that Ms. Holmes's failure to find marijuana on the other four students eviscerated the reasonableness of her expectation that marijuana would be found on F.M. Indeed, given Ms. Holmes's growing, evidence-based suspicion that *someone* in the group possessed marijuana, she might logically have interpreted the first four fruitless searches as mildly *increasing* the probability of discovering marijuana on F.M.'s person or effects.

identity, it ineluctably follows that Ms. Holmes could have identified and confronted the student if the report had proven false. And the tip, though not conclusively so, was at least strongly substantiated by surveillance footage. In these respects, the student's report resembles one made in an anonymous 911 call in *Navarette v. California*, --- U.S. ----, 134 S. Ct. 1683 (2014)—a call the Supreme Court deemed sufficiently reliable for purposes of reasonable suspicion because (1) the 911 system could have unmasked the anonymous caller in the event of a false alert, and (2) subsequent investigation corroborated the caller's report. *See* 134 S. Ct. at 1689–90. Ultimately, given our well-settled rule that "there is no need to establish the veracity of [an] informant" when "there is sufficient independent corroboration of [the] informant's information," *United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)), we conclude that the report that provided the impetus for the search bolstered Ms. Holmes's reasonable suspicion of wrongdoing by F.M.

In addition, A.M. contends that the passage of a few hours' time between the alleged drug transaction and the search of F.M. extinguished any reasonable suspicion Ms. Holmes might have possessed. We disagree. Although the *Safford* Court did opine that "if [a report] had been [made] *a few days* before, that would weigh heavily against any reasonable conclusion that [the student] presently had [contraband] on her person," 557 U.S. at 376 (emphasis added), that hypothetical

71

situation is obviously distinguishable. A.M. has never alleged a hiatus of that duration, and, on this record, she could not reasonably do so. The fact that a few *hours* elapsed between the student's report and the search of F.M. does not shake our confidence in the reasonableness of Ms. Holmes's belief—grounded in statements of other students and video evidence—that there was at least a fair probability that F.M. was carrying contraband.

Again, given all of these factors, we conclude that the record demonstrates articulable and particularized indicia of a sufficient probability of wrongdoing by F.M. This plainly satisfies the *T.L.O.* Court's controlling formulation of the school-search rubric; consequently, we conclude that the search of F.M. was justified at its inception.

### b. Reasonable in Scope

Once the search of F.M. began, it could remain constitutionally sound only insofar as it was "permissible in its scope" by using measures "reasonably related to the objectives of the search and not excessively intrusive" under the totality of the circumstances. *T.L.O.*, 469 U.S. at 342; *see Brannum v. Overton Cty. Sch. Bd.*, 516 F.3d 489, 496 (6th Cir. 2008) ("[I]t is necessary . . . that the [search] method chosen was, in the circumstances, *justifiably* intrusive in light of the purpose of the policy being carried out."). We conclude that it was.

To begin, it is settled under *Safford* that a search of a student which is justified at its inception is also justified as to outer clothing and a backpack.

Pursuant to *Safford*, "[i]f a student is reasonably suspected of giving out contraband [items], [he] is reasonably suspected of carrying them on [his] person and in the carryall that has become an item of student uniform in most places today"—that is, the backpack. 557 U.S. at 373–74. *Safford* suggests that this is true as a matter of logic: "if '[a school administrator's] reasonable suspicion of [contraband] distribution were not understood to support searches of outer clothes and backpack, it would not justify any search worth making.'" *Id.* at 374 (citation omitted). Here, A.M. argues that the search of F.M. transcended outer clothing and effects; she claims it ventured into the realm of an unjustified strip search.

Before asking F.M. to remove any clothing, Ms. Holmes obtained certain clues from his pockets and backpack suggesting the possibility of a drug transaction. Namely, she found $200 in cash—an arguably unusual amount of money for a middle-school student to carry, and certainly a relevant factor in a drug-related investigation. *See, e.g.*, *United States v. Wagoner Cty. Real Estate*, 278 F.3d 1091, 1094 (10th Cir. 2002) (assigning significance to "several hundred dollars in cash" uncovered in a search for contraband); *United States v. Mendoza-Salgado*, 964 F.2d 993, 1008 (10th Cir. 1992) (noting that "courts generally view items such as . . . large quantities of cash . . . as 'tools of the trade' for distributing illegal drugs"). Ms. Holmes also found a belt bearing the image of a marijuana leaf, which at least reasonably indicated F.M.'s interest in, or affiliation with the use of, marijuana. *See, e.g.*, *United States v. Salgado*, 761

73

F.3d 861, 865–66 (8th Cir. 2014) ("[The officer] also observed . . . [a] jacket embroidered with a large marijuana leaf in the back seat, and reasonably associated it with potential drug activity."); *Lorenzo v. City of Tampa*, 259 F. App'x 239, 240 (11th Cir. 2007) (per curiam) (deeming relevant to the issue of probable cause handbills depicting "a picture of a marijuana leaf"). Finally, Ms. Holmes found a bandana, which we have considered "gang-related clothing" in describing evidence obtained in searches. *See United States v. Roach*, 582 F.3d 1192, 1198 (10th Cir. 2009). These foregoing items provided support to continue the search of F.M.

Though for purposes of qualified immunity we ordinarily do accept the facts that a plaintiff like A.M. alleges, we do so only insofar as those facts have a basis in the record—as relevant here, only insofar as A.M.'s account of the search does not patently conflict with the record's video footage. *See, e.g.*, *Thomson*, 584 F.3d at 1312. The video demonstrates that F.M. was first asked to remove his shoes and his jeans, leaving him in a short-sleeved shirt, a long-sleeved shirt, two pairs of athletic shorts, and boxer-shorts underwear. He then flipped down the waistband of his *outer pair* of athletic shorts, but he left undisturbed the waistbands of his other pair of athletic shorts and his boxer shorts. Finally, he removed his outer pair of athletic shorts and his outer (short-sleeved) shirt so that when the search concluded, he was still wearing a long-sleeved shirt, a pair of

74

athletic shorts, and underwear.  Soon afterward, he got dressed as he had been prior to the search.

Based on this sequence of events, we believe A.M. stretches the term "strip search" beyond recognition in her attempt to apply it here.[22]  The video unequivocally shows that F.M. was only prompted to remove outer clothing and that he was wearing additional layers of non-intimate street clothing underneath the removed items.  Thus, because the scope of the search at all times remained reasonable, the search satisfied the strictures of the Fourth Amendment.

Comparing the search of F.M. to the search at issue in *Safford* underscores why Ms. Holmes did not allow the search to become unreasonable in scope.  In *Safford*, a thirteen-year-old female student was suspected of possessing prescription pain-relief pills.  Acting on a report that the student was distributing the pills, the school nurse asked her "to remove her jacket, socks, and shoes, leaving her in stretch pants and a T-shirt (both without pockets)."  *Safford*, 557 U.S. at 369.  The nurse then asked her to remove her shirt and pants, "to pull her bra out and to the side and shake it, and to pull out the elastic on her underpants,

---

[22]    Although we conclude that the facts of *this* particular search do not implicate a genuine strip search, we note the potential for ambiguity in future cases because the Supreme Court did not explicitly define the term in *Safford*. *See, e.g.*, Diana R. Donahoe, *Strip Searches of Students: Addressing the Undressing of Children in Schools and Redressing the Fourth Amendment Violations*, 75 Mo. L. Rev. 1123, 1153 (2010) (opining that "it will be difficult for school officials and courts to determine whether a strip search has actually occurred using a sliding scale test because the [*Safford*] Court refused to label or define the term 'strip search'").

thus exposing her breasts and pelvic area to some degree." *Id.* The Court found no constitutional violation in searching the student's outer clothing because that conduct (1) was justified by a fair probability of discovering evidence of wrongdoing, and (2) was related to the scope of a search for prohibited pills. But the Court reached a different conclusion as to the school nurse's second step of requiring the student to manipulate her undergarments.

Specifically, the Court held that the second aspect of the challenged search violated the Fourth Amendment's prohibition on unreasonable searches because:

> [t]he very fact of [the student's] pulling her underwear away from her body in the presence of the [school] officials who were able to see her necessarily exposed her breasts and pelvic area to some degree, and both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings.
>
> [The student's] subjective expectation of privacy against such a search is inherent in her account of it as embarrassing, frightening, and humiliating.

*Id.* at 374–75. The distinction appears clear: whereas reasonable suspicion (as enunciated in *T.L.O.*) supporting a fair probability of finding contraband permits a search of *outer* clothing, a higher level of justification is necessary to proceed with a search that will expose a student's intimate areas.

Unlike the student in *Safford*, in this case F.M. was at all times covered by at least one pair of pants (athletic shorts), one shirt, and underwear. The search

of F.M. can therefore only be fairly characterized as implicating outerwear, even though it involved more than one layer of clothing. Mindful that the reporting student claimed to have seen baggies of marijuana, we conclude that asking F.M. to remove more than one external article of clothing was consistent with the objective of detecting small items. In light of the foregoing, we are satisfied that the search of F.M. was not excessively intrusive in its scope; rather, we hold that it was thoroughly reasonable in that regard.

In sum, we conclude that Ms. Holmes's search of F.M. was supported by reasonable suspicion as required by the Supreme Court's holding in *T.L.O.* The search was both justified at its inception and reasonable in scope. Accordingly, A.M. has failed to demonstrate any Fourth Amendment violation premised on an unreasonable search by Ms. Holmes. We therefore affirm the district court's grant of qualified immunity to Ms. Holmes on this claim.

## 2. Retaliation Claim

Next, A.M. alleges that Ms. Holmes searched F.M. in retaliation for A.M.'s exercise of her First Amendment rights—*viz.*, that the search was a reprisal for A.M.'s remarks to the media about the May 2011 arrest. The district court granted qualified immunity to Ms. Holmes on this claim, reasoning: "Because the search was objectively supported by reasonable suspicion, even assuming *arguendo* that Defendant was motivated by retaliatory animus, . . . that would not be enough to violate clearly established law." Aplt.'s App. (14-2066) at 169.

77

We, too, conclude that Ms. Holmes is entitled to qualified immunity on A.M.'s

First Amendment retaliation claim.  Recognizing that we may affirm on any

ground supported by the record,[23] we deem it appropriate to affirm on the ground

that there was no evidence that Ms. Holmes's search of F.M. was substantially

motivated by A.M.'s exercise of her First Amendment rights.

"[T]he law is settled that as a general matter the First Amendment prohibits

government officials from subjecting an individual to retaliatory actions . . . for

speaking out."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  To prevail on a

First Amendment retaliation claim, a plaintiff must show:

> (1) that she was engaged in a constitutionally protected activity;
> (2) that a defendant's action caused her to suffer an injury that
> would chill a person of ordinary firmness from continuing to
> engage in that activity; and (3) that a defendant's action was
> substantially motivated as a response to her exercise of her First
> Amendment speech rights.

*Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007); *accord Buck v. City of*

*Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008).

---

[23]     *See, e.g.*, *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1192
(10th Cir. 2015) ("[W]e can affirm on any ground supported by the record, so
long as the appellant has had a fair opportunity to address that ground." (quoting
*Alpine Bank v. Hubbell*, 555 F.3d 1097, 1108 (10th Cir. 2009))); *Schanzenbach v.
Town of Opal*, 706 F.3d 1269, 1272 (10th Cir. 2013) ("We can affirm on any
ground supported by the record, so long as the appellant has had a fair
opportunity to address that ground." (quoting *Merrifield v. Bd. of Cty. Comm'rs*,
654 F.3d 1073, 1077 (10th Cir. 2011))); *Vaughn v. Epworth Villa*, 537 F.3d 1147,
1150 (10th Cir. 2008) ("[W]e may affirm on any basis supported by the record,
even though not relied on by the district court." (quoting *Seegmiller v. LaVerkin
City*, 528 F.3d 762, 766 (10th Cir. 2008))).

Ms. Holmes has raised the defense of qualified immunity. First, she argues that it was not clearly established in November 2011 that she could be subject to a viable First Amendment retaliation claim predicated on her decision to conduct an in-school search of a student that was supported by reasonable suspicion. Second, in the alternative, Ms. Holmes argues that she may avoid § 1983 liability because A.M. has failed to offer any evidence that Ms. Holmes's search was substantially motivated by a desire for retaliation. Because we agree with Ms. Holmes's second alternative argument, we need not reach the merits of her first.

In order to establish liability for any claim brought under § 1983, and to defeat a claim of qualified immunity, a plaintiff must present evidence of "a violation traceable to a defendant-official's 'own individual actions.'" *Pahls*, 718 F.3d at 1225 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). "Because § 1983 . . . [is a] vehicle[] for imposing personal liability on government officials, we have stressed the need for careful attention to particulars, . . . . '[I]t is particularly important' that plaintiffs 'make clear exactly *who* is alleged to have done *what* to *whom*, . . . as distinguished from collective allegations'"—more specifically, "it is incumbent upon a plaintiff to 'identify *specific* actions taken by *particular* defendants' in order to make out a viable § 1983 . . . claim." *Id.* at 1226 (third alteration and third omission in original) (citations omitted). Thus, we have made clear that "[t]o make out [a] viable § 1983 . . . claim[] *and* to overcome defendants' assertions of qualified immunity," a plaintiff "must do

79

more than show that their rights 'were violated' or that 'defendants,' as a collective and undifferentiated whole, were responsible for those violations," and a "[f]ailure to make this [more particularized, defendant-specific] showing both dooms plaintiffs' § 1983 . . . claim[] and entitles defendants to qualified immunity." *Id.* at 1228.

More specifically, in cases where plaintiffs have presented enough individualized evidence of a substantial motive to retaliate to establish § 1983 liability for a First Amendment retaliation claim, we have emphasized that the evidence indicated that *each individual defendant* had such a substantial motive. For example, in *Howards v. McLaughlin*, 634 F.3d 1131 (10th Cir. 2011), *rev'd on other grounds sub nom. Reichle v. Howards*, 132 S. Ct. 2088 (2012), we concluded that the plaintiff Mr. Howards had provided sufficient evidence to deprive each of the defendants, Agents Doyle and Reichle, of qualified immunity on his First Amendment retaliation claim because the evidence indicated that each defendant agent may have been substantially motivated by Mr. Howards's speech when they arrested him. Specifically, we reasoned that Mr. Howards had provided evidence that: (1) Agent Doyle overheard Mr. Howards's speech and admitted that the comment "disturbed" him, (2) Agent Reichle was told about Mr. Howards's speech by both Agent Doyle and Mr. Howards himself, and upon being told, he "became visibly angry," and (3) Agent Reichle admitted that he considered Mr. Howards's speech when deciding to arrest him. *Howards*, 634

80

F.3d at 1145 (quoting the record). *Howards* illustrates our focus on whether the plaintiff has presented individualized evidence that each defendant possessed a substantial motive to retaliate in order to support liability under § 1983 and overcome a claim of qualified immunity. Applying this general principle here, it is clear that A.M. must show by reference to individualized evidence that Ms. Holmes's search of F.M. was substantially motivated by a personal desire to retaliate against A.M. for her exercise of free speech. A.M. has failed to carry this proof burden.

A.M. relied solely on Officer Acosta's testimony to show that Ms. Holmes had a substantial motive to retaliate against her. Specifically, in response to the motion for summary judgment, A.M. argued that "the testimony of Officer Acosta proves shows [sic] that Plaintiff's actions in contacting the media after the arrest of F.M. caused angst among the administration of [CMS] for which F.M. was thereafter retaliated against." Aplt.'s App. (14-2066) at 100. More specifically, A.M. argued that Officer Acosta's testimony showed that

> Defendant [i.e., Ms. Holmes] and other school administrators were bothered by Plaintiff's exercise of her First Amendment rights when she contacted the media after the arrest of F.M. for burping, to the extent that "for the reasons of everything that happened in May, the idea was we're going to make sure we cross ou[r] Ts and dot our Is on this go-round" when F.M. was targeted for a strip search.

*Id.* at 89 (quoting Acosta testimony).

81

However, in truth, Officer Acosta's testimony (overall) is generalized and, notably, not specifically focused on Ms. Holmes's conduct. Officer Acosta testified that media reporting of F.M.'s arrest in May 2011 "really bothered the administration," "bothered Ms. Labarge," and "bothered a lot of the teachers," including Ms. Mines-Hornbeck. *Id.* at 115 (Acosta's Dep., dated Dec. 3, 2012). Officer Acosta elaborated that he "just kn[e]w that the general atmosphere in the school was kind of—you know, people were just upset at seeing it." *Id.* at 116. He noted that "[t]he one thing that [he] c[ould] recall that Ms. Labarge told [him] [was] . . . [the school] had just got an award," and Ms. LaBarge "was upset at the fact that . . . there could have been something positive to cover [instead of the negative news of the arrest]." *Id.* Officer Acosta added that "when we dealt with [F.M.] in November, for the reasons of everything that happened in May, the idea was we're going to make sure we cross our Ts and dot our Is on this go-round." *Id.* at 115. These statements provide the only evidentiary support for A.M.'s claim that Ms. Holmes's search was substantially motivated by a desire to retaliate against A.M. because she spoke to the media about F.M.'s May 2011 arrest.

Even viewed in the light most favorable to A.M., this evidence falls far short of showing that Ms. Holmes's search was substantially motivated by a desire to retaliate against A.M. for her remarks to the media. Critically, Officer Acosta never suggested that *Ms. Holmes* was upset by the media reporting. In

82

fact, he never testified that Ms. Holmes was even aware that A.M. had spoken to the media.  Moreover, Officer Acosta never suggested that *anyone*—not even Ms. Labarge or Ms. Mines-Hornbeck (the only two individuals whose reactions he could specifically remember)—was upset *at A.M.* for speaking to the media.  This lack of particularized evidence is simply not sufficient to support liability under § 1983, or to defeat Ms. Holmes's claim of qualified immunity.  *See Pahls*, 718 F.3d at 1226 ("[I]t is incumbent upon a plaintiff to 'identify *specific* actions taken by *particular* defendants' in order to make out a viable § 1983 . . . claim." (citation omitted)); *id.* at 1228 ("To make out [a] viable § 1983 . . . claim[] *and* to overcome defendants' assertions of qualified immunity, plaintiffs . . . . must do more than show that their rights 'were violated' or that 'defendants,' as a collective and undifferentiated whole, were responsible for those violations. . . . Failure to make this showing both dooms plaintiffs' § 1983 . . . claim[] and entitles defendants to qualified immunity.").

Furthermore, to the extent that a reasonable jury *could* derive any inference from Officer Acosta's testimony that Ms. Holmes possessed a retaliatory motive against A.M.—and to be clear, it could not—any such inference would be significantly weakened by the delay between when A.M. spoke to the media about F.M.'s arrest and when Ms. Holmes searched F.M.  The search occurred nearly six months after A.M. spoke with the media about F.M.'s arrest.  We have said that "a long delay" between the exercise of free speech and the allegedly

83

retaliatory conduct "tend[s] to undermine any inference of retaliatory motive and weaken the causal link." *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005). We conclude that A.M. has failed to present sufficient evidence that, when Ms. Holmes searched F.M., she possessed a substantial retaliatory motive with respect to A.M. based on comments that A.M. made to the media nearly six months prior to the search.

In sum, based on the foregoing, we conclude that Ms. Holmes is entitled to qualified immunity on this claim, and the district court correctly granted summary judgment for her. *See, e.g.*, *Trant v. Oklahoma*, 754 F.3d 1158, 1170–71 (10th Cir. 2014) (concluding that the district court "correctly granted summary judgment for Jordan" because "Trant has pointed to no evidence, besides temporal proximity, that Jordan's comments were substantially motivated by Trant's protected speech or that Jordan made his comments with a retaliatory intent").

Before turning to A.M.'s next contention of error regarding the district court's equal-protection ruling, we pause to underscore the fairness of our decision to resolve A.M.'s First Amendment retaliation challenge on this alternative evidentiary-sufficiency ground. It is true that Ms. Holmes did not move for summary judgment on the First Amendment retaliation claim based on the evidentiary-sufficency ground; instead, she contended that there was not clearly established law to support the claim. However, it is patent to us that A.M.

84

had a fair opportunity to address the evidentiary-sufficiency issue before the district court and to make a record regarding it.

Indeed, although Ms. Holmes did not raise the issue of evidentiary sufficiency in the district court, A.M. did. Specifically, in response to Ms. Holmes's motion for summary judgment, A.M. argued that Ms. Holmes's search was substantially motivated by a desire to retaliate, and she cited Officer Acosta's testimony to support this argument. Ms. Holmes then replied to A.M.'s evidentiary-sufficiency argument by contending that A.M. "provide[d] no factual support for her claim that *Defendant Holmes* was upset by Plaintiff's decision to speak to the media about the arrest." Aplt.'s App. (14-2066) at 143. In the district court, therefore, the parties took positions on whether A.M. had provided sufficient evidence of a substantial motive to retaliate; they briefed the issue and submitted evidence regarding it.

Furthermore, on appeal, A.M. has tackled Ms. Holmes's alternative evidentiary-sufficiency argument head-on and never suggested that it would be unfair for us to consider the merits of it. Indeed, A.M. has clarified in her reply brief that "[t]he parties agree that '[t]o make a First Amendment retaliation claim, "a plaintiff must show that . . . the government's actions were substantially motivated as a response to his constitutionally protected conduct."'" Reply Br. (14-2066) at 22 (second alteration in original) (quoting *Stonecipher*, 759 F.3d at 1147). A.M. then has proceeded to argue that she provided sufficient evidence of

85

a substantial motive to retaliate in this case. Moreover, A.M. has argued in conclusion that "it was error for the District Court to grant Holmes summary judgment on A.M.'s First Amendment retaliation claim both on the ground that the claim was not clearly established and on Holmes' asserted alternative ground that A.M. failed to provide evidence of retaliatory animus." *Id.* at 24–25. In sum, A.M. has had a fair opportunity to respond to the evidentiary-sufficiency issue: specifically, we note that (1) she was the one who first raised the issue in the district court, (2) the parties briefed and provided evidence on the issue in the district court, (3) A.M. has never asserted that it would be unfair for us to resolve the First Amendment retaliation claim on this ground, and (4) to the contrary, A.M. has continued to engage the issue on the merits.

As we turn to A.M.'s challenge to the district court's equal-protection ruling, we briefly reprise our merits conclusion here: Ms. Holmes is entitled to qualified immunity on A.M.'s First Amendment retaliation claim because A.M. has failed to provide sufficient evidence to raise a triable issue that Ms. Holmes's search of F.M. was substantially motivated by a desire to retaliate against A.M for her exercise of free speech.

### 3. Equal-Protection Claim

A.M. alleges that Ms. Holmes searched F.M. in a more intrusive fashion than she did the other four students. Accordingly, she submits that Ms. Holmes singled F.M. out for a markedly different search in violation of F.M.'s right to

equal protection, as safeguarded by the Fourteenth Amendment. We conclude that, on this record, A.M. has failed to set forth a legally cognizable Fourteenth Amendment equal-protection claim (and, more specifically, the "class-of-one" variant of such a claim). Consequently, we affirm the district court's grant of summary judgment to Ms. Holmes on this claim.

"The Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'" *Kitchen v. Herbert*, 755 F.3d 1193, 1222 (10th Cir.) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)), *cert. denied*, --- U.S. ----, 135 S. Ct. 265 (2014). Generally speaking, equal-protection jurisprudence is "concerned with governmental action that disproportionately burdens certain classes of citizens." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215–16 (10th Cir. 2011); *see Price-Cornelison*, 524 F.3d at 1109 (discussing equal-protection claims based on governmental conduct involving, *inter alia*, "suspect" or "quasi-suspect" classifications of groups); *accord Hassan v. City of New York*, 804 F.3d 277, 298 (3d Cir. 2015) ("At a minimum, intentional discrimination against any 'identifiable group' is subject to rational-basis review, which requires the classification to be rationally related to a legitimate governmental purpose. Where a 'quasi-suspect' or 'suspect' classification is at issue, however, the challenged action must survive 'intermediate scrutiny' or 'strict scrutiny.'" (citation omitted)); *see also Vasquez v. Cooper*, 862 F.2d 250, 251–52 (10th Cir. 1988) ("Unless it provokes strict

judicial scrutiny, a state practice that distinguishes among classes of people will typically survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose.").

But this is not always so; the equal-protection inquiry does not always relate to groups. Indeed, in *Village of Willowbrook v. Olech*, the Supreme Court carved out a "class of one" equal-protection claim; it held that a plaintiff may state such a claim by alleging that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. 562, 564 (2000) (per curiam); *see also* 3 Ronald D. Rotunda & John E. Nowak, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 18.2(a) (5th ed. 2012) ("If the government applies the law in a certain manner to all persons except a single individual, that single individual may bring an equal protection claim against the government even though the individual is 'a class of one.'"). Where, as here, a plaintiff brings a class-of-one claim, she must demonstrate (1) that "other 'similarly situated' individuals were treated differently" from her, and (2) that "there is no 'rational basis' for [the different treatment]." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 688–89 (10th Cir. 2012) (citations omitted).

"We have approached class-of-one claims with caution, wary of 'turning even quotidian exercises of government discretion into constitutional causes.'" *Kan. Penn Gaming*, 656 F.3d at 1216 (quoting *Jicarilla Apache Nation v. Rio*

*Arriba Cty.*, 440 F.3d 1202, 1209 (10th Cir. 2006)). Our circumspection in this regard stems from the fact that when "[l]ooking only at one individual, . . . there is no way to know whether the [alleged] difference in treatment was occasioned by legitimate or illegitimate considerations without a comprehensive and largely subjective canvassing of all possible relevant factors." *Jennings v. City of Stillwater*, 383 F.3d 1199, 1213–14 (10th Cir. 2004). In other words, the sample size in a class-of-one claim is obviously too small to permit a plaintiff to paint the contours of the claim in broad brushstrokes. "It is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the [allegedly] favored class." *Id.* at 1214. This is because, at its core, "[t]he Equal Protection Clause . . . . keeps governmental decisionmakers from treating differently persons *who are in all relevant respects alike*." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 54 (10th Cir. 2013) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

In this case, A.M.'s endeavor to state a class-of-one claim necessarily fails because she cannot "first establish that others, 'similarly situated in every material respect[,]' were treated differently" from F.M. during the in-school search. *Kan. Penn Gaming*, 656 F.3d at 1216 (quoting *Jicarilla*, 440 F.3d at 1210). Reduced to its essence, her argument is that other students searched that day—"none [of whom] were asked to remove articles of clothing," Aplt.'s Opening Br. (14-2066) at 52—were treated differently from F.M., who was asked

89

to remove some outerwear.  This skeletal argument does not advance A.M.'s cause for at least two reasons.

First, it is not clear from the record whether, as A.M. maintains, F.M. was the *only* student required to remove clothing during the search for contraband. Only the search of F.M. was video-recorded, which significantly impedes our ability to review the searches of the remaining students.  A.M. consequently relies exclusively on Officer Acosta's description of the searches in setting out her class-of-one claim—an account which, in our view, reveals little of material significance.  Officer Acosta testified that the searches were conducted "consistently with each student, from what [he] remember[ed] seeing," and that they involved "going through the backpack[s], empty[ing] . . . pockets, things of that nature."  Aplt.'s App. (14-2066) at 119.  But, critically, he stated more than once that he did not recall whether *any* student—including F.M.—had been asked to remove specific articles of clothing.  *See id.* (noting that F.M. "may have" taken off a shirt, that he "couldn't tell you one way or other" if any other male students were required to remove clothing, and that the female student, at best, "may have taken off her shoes").  It is thus evident, from that limited testimony, that Officer Acosta's recollection of events cannot offer the "specific and detailed account of the nature of the preferred treatment of the favored class" necessary to form the basis of a class-of-one equal-protection claim.  *Jennings*, 383 F.3d at 1214.

90

Second, even assuming *arguendo* that only F.M. was directed to remove clothing when searched, A.M. has not demonstrated that Ms. Holmes's treatment of F.M. differed from her treatment of *similarly situated* students. We conclude that A.M.'s contrary assertion that "the conduct that was attributed to F.M.'s . . . search was no different than that of the other students involved in the alleged transaction," Aplt.'s Opening Br. (14-2066) at 54, is not supported by the record and utterly unpersuasive. In point of fact, A.M. identifies in her opening brief several obvious reasons why Ms. Holmes could have viewed F.M.'s circumstances as distinct from those of his peers: "because F.M. voluntarily handed over the novelty marijuana leaf belt buckle, because Holmes found a bandana in his back-pack, and because F.M. had more cash on him that day than Holmes thought the average student should." *Id.* at 52. It is undisputed that F.M., and F.M. alone, presented these issues. In other words, there is no evidence that any of the other searched students possessed a bandana that possibly suggested gang affiliation, a belt buckle that suggested interest in marijuana, or an unusually large amount of cash. F.M. possessed all three suspicious items, which patently demonstrates that he was *not* similarly situated "in every material respect," *Jicarilla*, 440 F.3d at 1210, to the other students that Ms. Holmes

91

searched.  These differences suffice to defeat a claim of irrational differences in treatment[24] from other students similarly situated.

In sum, we conclude that, on the record before us, F.M. was not similarly situated to the other students searched in November 2011.  Therefore, the district court properly determined that A.M.'s class-of-one equal-protection claim was deficient as a matter of law.  We accordingly affirm the district court's grant of summary judgment to Ms. Holmes on A.M.'s Fourteenth Amendment claim.

## C.  Claims Against Ms. LaBarge

Lastly, A.M. contends that the district court committed reversible error when it granted summary judgment to Ms. LaBarge on the Fourth Amendment unreasonable-search claim.  The district court awarded qualified immunity to Ms. LaBarge after finding that A.M. had not carried her burden of demonstrating that Ms. LaBarge committed a constitutional violation with respect to F.M.  It specifically concluded, with reference to the Supreme Court's holdings in *Safford* and *T.L.O.*, that the November 2011 in-school search was justified at its inception and reasonable in scope.

In challenging the merits of the district court's Fourth Amendment qualified-immunity decision with respect to Ms. LaBarge, A.M. limits her

---

[24]     We note as well that in any event, based upon our Fourth Amendment unreasonable-search analysis *supra*, the search of F.M. could hardly be deemed irrational conduct devoid of any legitimate state objective.  *See Olech*, 528 U.S. at 564.

briefing to incorporating the arguments she made in her brief in *A.M. v. Holmes*, No. 14-2066 (i.e., the related appeal with which *A.M. v. LaBarge*, No. 14-2183, has been consolidated). Ms. LaBarge likewise incorporates by reference the arguments advanced in Ms. Holmes's appellate response brief regarding the validity of the search. *See* Fed. R. App. P. 28(i) ("In a case involving more than one appellant or appellee, including consolidated cases, any number of appellants or appellees may join in a brief, and any party may adopt by reference a part of another's brief."). We have fully addressed all of the parties' relevant contentions in Part III.B.1, *supra*, in concluding that the district court properly awarded qualified immunity to Ms. Holmes on A.M.'s Fourth Amendment unreasonable-search claim. We discern no basis for following a different course insofar as this claim implicates Ms. LaBarge's conduct.

Accordingly, for the same reasons set forth in Part III.B.1, *supra*—i.e., based on the same rationale we used to resolve the Fourth Amendment claim in the Holmes appeal—we conclude that the district court did not err in finding that A.M. did not show that Ms. LaBarge committed a Fourth Amendment violation in searching F.M. We therefore affirm the court's grant of qualified immunity to Ms. LaBarge on this claim.

## IV. CONCLUSION

For the reasons discussed above, we **AFFIRM** the judgment of the district court in its three orders resolving A.M.'s claims against Officer Acosta, Ms.

93

Holmes, and Ms. LaBarge.  Regarding Officer Acosta, we: (1) conclude that the district court did not issue an improper *sua sponte* grant of summary judgment in his favor; (2) **AFFIRM** the court's grant of qualified immunity to him on A.M.'s Fourth Amendment unlawful-arrest claim; and (3) **AFFIRM** the court's grant of qualified immunity to him on A.M.'s Fourth Amendment excessive-force claim. With respect to Ms. Holmes, we: (1) **AFFIRM** the court's grant of qualified immunity to her on A.M.'s Fourth Amendment unreasonable-search claim; (2) **AFFIRM** the court's grant of qualified immunity to her on A.M.'s First Amendment retaliation claim; and (3) **AFFIRM** the court's grant of summary judgment to her on A.M.'s Fourteenth Amendment equal-protection claim. Finally, as regards Ms. LaBarge, we **AFFIRM** the court's grant of qualified immunity to her on A.M.'s Fourth amendment unreasonable-search claim.

Nos. 14-2066, 14-2183, *A.M. v. Holmes*

**GORSUCH**, Circuit Judge, dissenting.

If a seventh grader starts trading fake burps for laughs in gym class, what's a teacher to do? Order extra laps? Detention? A trip to the principal's office? Maybe. But then again, maybe that's too old school. Maybe today you call a police officer. And maybe today the officer decides that, instead of just escorting the now compliant thirteen year old to the principal's office, an arrest would be a better idea. So out come the handcuffs and off goes the child to juvenile detention. My colleagues suggest the law permits exactly this option and they offer ninety-four pages explaining why they think that's so. Respectfully, I remain unpersuaded.

The simple fact is the New Mexico Court of Appeals long ago alerted law enforcement that the statutory language on which the officer relied for the arrest in this case does not criminalize "noise[s] or diversion[s]" that merely "disturb the peace or good order" of individual classes. *State v. Silva*, 525 P.2d 903, 907 (N.M. Ct. App. 1974). Instead, the court explained, the law requires "a more substantial, more physical invasion" of the school's operations — proof that the student more "substantially interfered" with the "actual functioning" of the school. *Id.* at 907-08. What's more, other state courts have interpreted similar statutes similarly. They've sustained criminal convictions for students who created substantial disorders across an entire school. *See, e.g.*, *State v. Wiggins*, 158 S.E.2d 37, 42-44 (N.C. 1967); *State v. Midgett*, 174 S.E.2d 124, 127-28 (N.C.

Ct. App. 1970). But they've also refused to hold students criminally liable for classroom antics that "momentarily divert[ed] attention from the planned classroom activity" and "require[d] some intervention by a school official." *In re Jason W.*, 837 A.2d 168, 174 (Md. 2003). Even when the antics required a teacher to leave her class for several minutes, *In re Brown*, 562 S.E.2d 583, 586 (N.C. Ct. App. 2002), or otherwise "divert[ed] the teacher or the principal from other duties for a time," *P.J.B. v. State*, 999 So. 2d 581, 587 (Ala. Crim. App. 2008) (per curiam). *See also, e.g.*, *S.L. v. State*, 96 So. 3d 1080, 1083-84 (Fla. Dist. Ct. App. 2012). Respectfully, I would have thought this authority sufficient to alert any reasonable officer in this case that arresting a now compliant class clown for burping was going a step too far.

In response, my colleagues suggest that *Silva* is distinguishable because it interpreted not the state statute addressing misconduct in public schools on which the officer here relied, *see* N.M. Stat. Ann § 30-20-13(D), but another statute dealing with protests at colleges, *see* N.M. Stat. Ann. § 40A-20-10(C) (1972). And that much is true enough. But the unobscurable fact remains that the relevant language of the two statutes is *identical* — requiring the government to prove that the defendant "commit[ed] any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions" of a school. *Silva* expressly held that *this* language does *not* criminalize conduct that disturbs "merely the peace of the school session" but instead requires proof

that the defendant more substantially or materially "interfere[d] with the actual functioning" of the school. 525 P.2d at 907. Neither do my colleagues offer any reason why a reasonable officer could have thought this same language carried an entirely different meaning when applied to public school burps rather than college sit-ins — and the parties supply none. *Cf. Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

My colleagues likewise dismiss the authority from other states interpreting similar statutes similarly. Maj. Op. at 49-50. But again it's hard to see why. After all, these cases draw the same distinction suggested by *Silva* — between childish pranks and more seriously disruptive behaviors — and hold that only the latter are prohibited by statutes like the one before us today. And they draw that distinction, too, because disciplining children who temporarily distract classmates and interrupt lessons "is simply part of [traditional] school activity" and part of its "lawful mission . . . or function[]." *In re Jason W.*, 837 A.2d at 174; *see also In re Brown*, 562 S.E.2d at 585-86. Given that, I would have thought these cases would have only reinforced the lesson *Silva* already taught reasonable officers in New Mexico. *See Wilson v. Layne*, 526 U.S. 603, 617 (1999) (noting law may be clearly established if there is "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful").

-3-

Often enough the law can be "a ass — a idiot," Charles Dickens, *Oliver Twist* 520 (Dodd, Mead & Co. 1941) (1838) — and there is little we judges can do about it, for it is (or should be) emphatically our job to apply, not rewrite, the law enacted by the people's representatives. Indeed, a judge who likes every result he reaches is very likely a bad judge, reaching for results he prefers rather than those the law compels. So it is I admire my colleagues today, for no doubt they reach a result they dislike but believe the law demands — and in that I see the best of our profession and much to admire. It's only that, in this particular case, I don't believe the law happens to be quite as much of a ass as they do. I respectfully dissent.